[No. S004616. Crim. No. 23781. Feb. 20, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT LYNN PINHOLSTER, Defendant and Appellant.

874

COUNSEL

William B. Chapman, under appointment by the Supreme Court, Rogers, Joseph, O'Donnell & Quinn, Mark A. White, Kyra A. Subbotin and Connie M. Teevan for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Edward T. Fogel, and Carol Wendelin Pollack, Assistant Attorneys General, Thomas L. Willhite, Jr., William T. Harter and Kristofer Jorstad, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Defendant Scott Lynn Pinholster was convicted by a jury of first degree murder (Pen. Code, § 187)[1] of Thomas Johnson and Robert Beckett. The jury found true two multiple-murder special-circumstance allegations (§ 190.2, subd. (a)(3)) and allegations that each murder was committed during the perpetration of a robbery and a burglary. (§ 190.2, subds. (a)(17)(i) & (vii).) The jury also found as to each count that defendant personally used a knife. (§ 12022, subd. (b).) The jury returned the same verdicts and findings against codefendant Paul David Brown. In addition, the jury convicted defendant of burglary of the residence of Michael Kumar (§ 459), robbery of Johnson and Beckett (§ 211), with intentional infliction of great bodily injury and personal use of a knife (§§ 12022.7, 12022, subd. (b)). Defendant was convicted separately of the robbery of Todd Croutch (§ 211), and the jury found true an allegation that he was armed with a firearm (§ 12022, subd. (a)).

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

The jury fixed the penalty at death.[2] This appeal is automatic. We conclude that one multiple-murder special circumstance should be set aside, and the judgment otherwise is affirmed.

## I. Facts

### A. *Guilt Phase*

#### 1. *Prosecution Case*

In May 1981, defendant and another man robbed the Encino home of drug dealer Todd Croutch at gunpoint. Todd's parents and brothers were forced to lie on the living room floor while defendant demanded Todd's drugs and money, holding a cocked pistol to his head. Defendant threatened to kill Mrs. Croutch. During an ensuing search of defendant's residence, credit cards belonging to the Croutches were seized. Todd Croutch received a threatening phone call a month after the robbery. Todd believed the caller was defendant, and reported that defendant said he would kill Todd and his family if he testified. Defendant admitted committing the robbery.

In mid-December 1981, according to the testimony of Charles Kempf, defendant suggested to Kempf and three others that they rob Michael Kumar, a drug dealer who lived in Tarzana, and someone defendant considered "an easy mark." Once at the Kumar home, Kempf walked to the rear and formed the impression that no one was home. The would-be robbers waited, preferring to accost Kumar and force him to admit them rather than break in. Defendant said, holding a buck knife in his hand, that he would get the drugs out of Kumar "one way or the other." Kempf also reported that defendant bragged that he had stabbed someone in the rectum during another robbery. Kempf and another cohort, Richard Crane, backed out of the plan and the men drove off. Kempf had previously been convicted of receiving stolen property and was under arrest when he first told the authorities of these events. He asserted that he had received no promise of leniency or other benefits in return for his testimony.

In the early morning hours of January 9, 1982, Thomas Johnson and Robert Beckett were stabbed to death as they returned to the home of Michael Kumar in Tarzana, where they were housesitting.

Defendant's accomplice, Art Corona, testified that defendant, with whom he was acquainted, and he were at a social gathering in defendant's Van Nuys apartment complex on the evening of January 8, 1982. Defendant

---

[2]The People did not seek the death penalty against codefendant Brown.

solicited his participation in what was to be a robbery of Kumar. Defendant anticipated forcing entry into Kumar's home and taking marijuana, cocaine and money. Corona agreed and, using his own car, drove defendant and codefendant Brown toward Kumar's home. Defendant directed Corona to stop at the home of a woman who would help them gain entry to Kumar's home. At the woman's home, defendant went to the door but was refused entry twice. Defendant, who wore a buck knife in a leather sheath on his belt, as did the two other men, then stuck his knife through the door and scratched the hood of a nearby car with his knife.

Corona's testimony regarding this incident was corroborated by Lisa Tapar, her father, and another witness. Ms. Tapar was acquainted with both defendant and Kumar, and had the impression defendant planned to steal from Kumar. She reported that defendant arrived at her home between 12:30 and 2 a.m. on January 9, 1982, that she refused him entry, that he stabbed the front door with a knife, and then apparently inscribed her car with a swastika and lightning bolts.

Corona testified that on their arrival at the Kumar home, defendant knocked on the front door, then forcibly opened a side gate and broke a window at the rear of the home. Finding the back door could not be opened without a key, codefendant Brown found an open sliding glass door and they entered. They ransacked the house. Corona helped to stack stereo equipment in the living room. Defendant took a small amount of marijuana from a bedroom, and spilled a green substance in the kitchen. They heard a car arrive and saw two people approach. One opened the door and exclaimed that the police should be called. The burglars decided to leave, and Corona led the way to the sliding glass doors. The two victims, Johnson and Beckett, then came around the back. When Johnson tried to enter the house, defendant came around Corona and struck Johnson in the chest three or four times. Defendant backed him out of the house and onto the patio, demanding drugs and money and repeatedly striking him. Johnson dropped his wallet on the ground and obeyed defendant's order to sit. Then Beckett approached, and defendant attacked him. Corona saw that defendant was stabbing Beckett, striking him in the chest as Corona had seen defendant strike Johnson. Defendant repeatedly stabbed Beckett, again demanding money and drugs. Defendant picked up Johnson's wallet and took a wallet from Beckett's pocket. Defendant repeatedly kicked Beckett in the head. Corona then saw codefendant Brown stabbing Johnson in the chest. The three men withdrew, and Corona drove them back to defendant's apartment. Brown and defendant commented that they had "gotten them good," and Brown said he had "buried his knife to the hilt" in Johnson.

On their arrival at defendant's apartment, defendant washed his knife. Corona's wife Casey was present. A woman named Debbie arrived and

cleaned Brown's knife. Defendant split the proceeds of the robbery: $23 and a quarter-ounce of marijuana. Corona and his wife took Brown to a motel on Sepulveda Boulevard.

The next day defendant called Corona and directed him to "lie low." Two weeks later, Casey told Corona that the police were looking for him. Having talked to his brother Caesar, and Casey's mother and sister, Corona turned himself in. At the station, he waived his rights and gave a statement basically consistent with his trial testimony, except that he did not mention that he had seen Brown stab Johnson, and he did not mention taking his share of the loot when it was divided.

Casey Corona corroborated her husband's testimony about embarking on the robbery, and his testimony regarding returning to defendant's apartment and washing the knives and splitting the proceeds. She observed what appeared to be blood washing off defendant's knife. She heard defendant say: "It had to be done the way it was done. We had to do what we had to do." Art Corona later commented in Casey Corona's hearing that defendant had "gone crazy." Casey Corona had recently been arrested on a drug charge and had received some assistance from the prosecutor in entering a diversion program.

Before the preliminary hearing, according to Corona, defendant was on the county jail bus to court with Corona, and threatened to kill him if he, Corona, testified against defendant. Defendant advised Corona to assert his privilege against self-incrimination or face being blown up on his way to court. Defendant threatened Corona on several subsequent occasions.

Corona's credibility was impeached with his prior burglary conviction and his admission that he was a professional burglar who occasionally used heroin. He was to plead guilty to burglary and a violation of section 32 at the conclusion of the trial.

Physical evidence confirmed that defendant had been present in the Kumar house after it was ransacked. His palm print, smudged with green plant food, was found in one of the bedrooms. The owner stated that to his knowledge, defendant had never been in his house. Corona testified that defendant was wearing jeans and boots during the crime. In a search of defendant's apartment, police found boots that could have made a print in a pool of blood at the scene of the murders. The boots showed microscopic traces of human blood, as did a towel found in the apartment. A pair of jeans had a bloodstain on them as well, but having been washed, they were not tested to determine if the blood was human. Codefendant Brown was

arrested in possession of a buck knife with dimensions that corresponded to one of the stab wounds inflicted on Thomas Johnson. Near the hilt of the knife criminalists discovered traces of human blood. There were no traces of blood on Art Corona's buck knife, but there was human blood on the inside forearm of the sleeve of a shirt seized from Art Corona.

Police witnesses testified that the ransacking at the scene looked like a "drug ripoff" in its thoroughness, and that it would have taken one man an hour to do it all. They said that a window pane in the kitchen door had been removed, but that the door was deadbolted. The sliding glass doors at the rear of the house were open. Johnson's body was lying on the patio and Beckett's body was lying face down outside in an area of grass and gravel, in a pool of blood in which there was a large boot print. A county medical examiner was of the opinion that the two men had died between midnight and 3 a.m. on January 9, 1982. Beckett had received one fatal stab wound to the chest, while Johnson had received two fatal stab wounds, one 2.5 inches deep and one 4.5 inches deep. He had also been stabbed in the back. It appeared the fatal wounds were inflicted while Johnson was sitting or crouching. Beckett had also been stabbed in the right leg and hip, and suffered several abrasions including a large one in the back of the head, consistent with a kick.

### 2. *Defense Case: Brown*

Codefendant Brown testified that he had attended a party on January 8, 1982, at defendant's apartment building and got so drunk he could remember nothing, except that he was driven home around 10 or 11 p.m. and remained there with his girlfriend Wendy for the rest of the night. He knew nothing about the events at the Kumar home. His account of the evening was corroborated by his friend John Granara, who attended the party and testified that he drove Brown home about 10:30 or 10:45 p.m.

Brown's stepfather testified that he had cut himself on the knife found in Brown's possession.

County jail inmate Maxwell testified that Art Corona told him that Corona had done the double murder by himself, that he had stabbed one victim, and then ran to the other and stabbed him so that neither could escape.

Pathologist John Ryan testified that in his opinion, Johnson was not supine when stabbed, but was erect, standing near the door of the patio. The doctor opined that Johnson walked several feet, and then collapsed onto his right side.

### 3. *Defense Case: Defendant*

Defendant admitted the Croutch robbery. He asserted that he was a professional robber, but not a murderer. He said he had committed hundreds of robberies over the preceding six-year period. He used a gun, not a knife, and victimized drug dealers. He admitted a prior kidnapping conviction, but said that he had admitted the use of a knife only as a result of a plea bargain, not because it was true.

He had planned to rob Kumar, but he denied the abortive robbery attempt recounted by prosecution witness Kempf. Defendant said it was Kempf who suggested the robbery, but as Kempf had testified against another associate, defendant wanted nothing to do with Kempf.

On the evening of January 8, 1981, defendant threw a party in honor of his best friend, "Shotgun," whose funeral had been two days before. Around 8 p.m., defendant left to get drugs from Kumar's house to liven up the party. He knocked on Kumar's door and, hearing no response, went to the back and broke a pane in the kitchen door. It would not open, but another door swung open when he kicked it. He took a bag containing about half a pound of marijuana from a bedroom. He touched a bag containing a bluish substance in the bedroom, and spilled a bag containing green material in the kitchen. He did not ransack the house or stack the stereo equipment. He did not kill anyone.

He returned to the party a little before 9 p.m., and shared the marijuana he had taken. He drank heavily and smoked considerable marijuana. Art Corona wanted to know where he had gotten the marijuana. Around 11:30 p.m., because Corona complained that he was short of cash, defendant gave him Kumar's address in exchange for a third of whatever Corona could steal from him. Corona returned around 1 a.m., having been unable to find Kumar's house. Defendant gave him directions again. About 1:30 a.m. defendant went out for food, then went to tell Lisa Tapar that "Shotgun" was dead. When she slammed the door in his face, he stabbed the door and scratched a swastika and lightning bolt on her car. He returned home a little after 2 a.m. Art Corona arrived around 4 a.m., reporting he had gotten nothing from Kumar's home. The next morning, Corona called to ask defendant not to say anything about his trip the night before. Defendant told Corona about his own visit to Lisa Tapar.

Defendant's brother and several friends testified in defendant's behalf, confirming in basic outline his testimony regarding the party in his apartment building, the timing of his various absences, and his distribution of marijuana he provided around 9 p.m.

Defendant called Gian Norelli, who said he was present when Charles Kempf tried to get defendant to participate in a robbery of Kumar. He denied that the group of men actually went to Kumar's home, and he said that Kempf had a reputation as a liar. He was impeached with his prior inconsistent statement to the police, relating the earlier abortive attempt on the Kumar home in terms substantially the same as Kempf's testimony.

One Gary Mallory said Casey Corona had approached him near her home, asking what would happen if she were caught lying for her husband on the witness stand.

Terry Pinholster testified that the bloodstained boots found in defendant's apartment were his. Defendant testified that the boots were too small for him.

### 4. *Rebuttal*

Lisa Tapar denied that defendant had come to her home on January 9, 1982, in his own car, with which she was familiar. Rather, she saw Art Corona's station wagon nearby when defendant visited her. She was not acquainted with "Shotgun."

Michael Kumar denied keeping any marijuana in his bedroom. He said he kept it all in his safe. A large quantity of marijuana was seized from this safe.

Eric Klemetti testified that he had arranged a marijuana transaction with victim Johnson by telephone around 8 p.m. on January 8, 1982. When he arrived at the Kumar house about 9 p.m., Johnson was there and everything was in order. He saw no broken windows or spills in the kitchen.

A news article defendant claimed he saw on January 9, 1982, was actually not published until January 10, 1982, though the investigating officer mistakenly marked it with the earlier date. This copy was furnished to defendant during discovery, and defendant had access to the file while he represented himself.

Detective Quartararo reported that Gian Norelli had admitted going to Kumar's home with defendant and Crane to commit a robbery that never "panned out." The detective also said Norelli told him that Norelli had overheard defendant tell one of the Crane brothers that he, defendant, had stabbed two people in Tarzana. Quartararo said Norelli told him defendant had asked Norelli to lie for him while the two were in county jail. Norelli claimed he just wanted to get everything off his chest before he went to prison.

Detective Stoughton cast doubt on the testimony of Brown's girlfriend Wendy that Brown had returned to her on the night of January 8, 1982. When Stoughton interviewed her on January 26, 1982, she had said she waited for Brown on the night of January 8, 1982, that he finally came home between 3 and 4 a.m., that they argued heatedly, and that he left. She did not say at that time, as she did at trial, that Brown returned at 10 p.m. and fell into bed dead-drunk.

### B. *Penalty Phase*

#### 1. *Prosecution Case*

Defendant stipulated that he had suffered a prior conviction for kidnapping, with use of a knife. He conceded that there was no plea bargain with respect to the use allegation, and that he was identified as having held the knife to the victim's throat. Defendant stipulated that he had committed numerous disciplinary infractions during his prison term, for such behavior as throwing liquids at guards, and threatening to stab guards and throw them off the tier. He was classified and housed as a disciplinary problem and was subjected to a low calorie diet, a measure reserved for the most recalcitrant inmates.

Los Angeles County Probation Officer Taube testified that defendant, as a juvenile, had been in court for a hearing on a probation violation involving violation of curfew when he gave vent to a violent outburst, threatening everyone in court, and actually striking the bailiff. It took several officers to subdue him and escort him from the courtroom. Taube said defendant had been difficult to supervise because of gang activities. Defense counsel elected to pursue this on cross-examination, asking if defendant's gang activities had not subsided, and Taube said that they had not, and that defendant had been quite well known in the juvenile gang community at the time.

Los Angeles Police Officer Kaufman testified that when he was called to intervene in a fight involving a knife, defendant was combative with the police, faked an epileptic seizure, had to be restrained, threatened to kick the police officers from the back of the patrol car, and ultimately kicked him in the head. On cross-examination it appeared that there was little or no evidence of any knife fight, that the officer had little training regarding epilepsy, and that before the violent outburst, both officers had maced defendant in the face for trying to leave the scene.

Los Angeles Police Officer Guzman testified that he had arrested defendant, who first resisted, then dropped to the ground in a spasmatic attack.

During transport, defendant tried to kick him in the head and kicked his partner in the legs. They had to stop the car to restrain defendant, who issued continual threats to be revenged once he was released. Defendant complained that the restraint had injured his legs, and when he was taken to the hospital for X-rays, he spat on the police and kicked the X-ray machine.

Deputy Sheriff Loper testified that during custody pending trial, defendant had started a racial fight in the jail law library, that defendant had kneed the officer in the groin while the officer tried to restrain him, that it ultimately required four deputies to restrain defendant, and that defendant had admitted threatening Black inmates.

Deputy Sheriff Piggott testified that defendant was housed in the disciplinary module in the county jail because of assaults on other inmates and staff, and that his record showed 11 or 12 incidents of violence or threats of future violence. He had a fight with an inmate over a card game, on another occasion he struck an inmate in the head and ribs, he routinely threw urine at guards, he threatened to get a knife to kill a deputy and threatened to have friends on the outside kill another deputy, he was involved in a fight at the law library, and he assaulted an inmate in the lockup. In addition to the attack on Deputy Loper, he threw food and urine in the face of another deputy, attempted to kick a deputy who was transporting him, again threw urine in the face of a deputy, and struck two deputies in the ensuing melee. Defendant had said that he wanted to go to prison, and that if he were not sent to prison, he would do something to get there. On cross-examination, the officer said defendant was full of empty boasts and threats. On redirect, he testified that defendant's record showed 27 incidents of violation of jail rules. Deputy Barrett testifed that defendant told him that he thought he would get out of jail soon, and that when he got out he would have to kill Art Corona because he was so mad at him.

One Theodore Mesquita testified that he had gone looking for defendant to settle a matter of honor "man to man." It seems that defendant returned Mesquita's punches with a blow to the arm with a knife or razor, and that defendant pursued Mesquita on foot all the way to the hospital, where the wound was sewed up with 50 stitches. Finally, defendant's wife Cathy Smith testified that defendant had once struck her and had broken her jaw. On cross-examination she said that the attack occurred during one of defendant's epileptic seizures. On redirect she admitted telling the prosecutor that defendant faked seizures.

2. *Defense Case*

Defendant called his mother, who said that while he had not suffered economic deprivation as a child, he had had a poor relationship with his

stepfather, whose discipline of the boy bordered on abuse. Defendant had two head injuries as a child. When he was two, his mother ran over him with her car, injuring his head and tearing off an ear. When he was four or five, they were in a car accident in which defendant's head went through the windshield. Defendant was disruptive in school, but did better in a class for the educationally handicapped. A psychologist recommended defendant be committed to a mental hospital when he was 10, but his mother refused. He was committed to Camarillo State Hospital at age 12 as an emotionally handicapped child. Defendant fancied himself a neighborhood Robin Hood, and stole things and distributed them to the neighborhood children. He spent much of his youth in boys' homes, juvenile hall, and juvenile camps. When defendant was in the county jail at age 18, he was beaten severely and has had epilepsy ever since.

Defendant was always well behaved at home, but commented that he could not bring his gang friends home because the comfortable home would ruin his image. Defendant lived with his mother after his release from state prison, and he would shut himself in his room for long periods of time. He said that after his time in prison, he did not know how to open doors very well.

## II. DISCUSSION

### A. *Jury Selection Issues*

#### 1. *Joint Peremptory Challenges*

Defendant argues that the application to his trial of former sections 1070 and 1070.5 (see now Code Civ. Proc., § 231, subd. (a)) violated his state and federal constitutional rights to due process, equal protection, an impartial jury, and a reliable determination of penalty. These statutory provisions allotted to each defendant 5 separate peremptory challenges and 26 peremptory challenges to exercise jointly with his codefendant, but allotted to the prosecution 36 unrestricted challenges. Respondent claims that defendant's motion raising this issue in the trial court was premature, and that in any case there was no possibility of prejudice because defendant did not exhaust his peremptory challenges or object to the jury as constituted. Even if the claim is properly before us, we reject it on the merits, as we have done before. (*People* v. *Webster* (1991) 54 Cal.3d 411, 439 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1222-1223 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1004-1007 [248 Cal.Rptr. 568, 755 P.2d 1017].) We decline to reopen the question.

### 2. *Peremptory Challenge of Jurors With Reservations About the Death Penalty*

■ Defendant argues that the prosecutor's use of peremptory challenges to exclude prospective jurors with reservations about the death penalty deprived him of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution to a fundamentally fair and reliable determination of penalty by a jury that fairly represented the community. Respondent claims any error was waived by failure to object below, while defendant claims we must assume that the objection was made at unreported bench conferences. Even assuming that defendant is correct on the procedural point, we have rejected his argument consistently on the merits. (*People* v. *Turner* (1984) 37 Cal.3d 302, 315 [208 Cal.Rptr. 196, 690 P.2d 669], overruled on other grounds in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]; see also *People* v. *Gordon* (1990) 50 Cal.3d 1223, 1263 [270 Cal.Rptr. 451, 792 P.2d 251]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 249 [253 Cal.Rptr. 55, 763 P.2d 906].)[3]

■ Similarly, we have consistently rejected the argument defendant raises in a footnote "for preservation," that excusal for cause of jurors whose opposition to the death penalty would interfere with their ability to follow the instructions at the penalty phase denied him a fair and representative jury on the issue of guilt, in violation of his Fifth, Sixth and Fourteenth Amendment rights. (See, e.g., *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1254 [278 Cal.Rptr. 640, 805 P.2d 899]; *People* v. *Thompson* (1990) 50 Cal.3d 134, 157 [266 Cal.Rptr. 309, 785 P.2d 857], relying on *Lockhart* v. *McCree* (1986) 476 U.S. 162, 174-176 [90 L.Ed.2d 137, 148-149, 106 S.Ct. 1758].)

### 3. *Hypothetical Questions*

#### a. *Peremptory Challenges*

■ Defendant argues that his state and federal constitutional rights to an impartial jury and a fair and reliable determination of penalty were violated by the prosecutor's use in voir dire of hypothetical questions designed to aid her in exercising peremptory challenges. He claims these questions during the sequestered portion of voir dire impermissibly allowed her to exclude eight jurors who were not so opposed to the death penalty that they could not follow the instructions, but who might not have voted for the death penalty under the particular facts of this case. He maintains that by

---

[3]Appellant's citation to *Brown* v. *Rice* (W.D.N.C. 1988) 693 F.Supp. 381, 393, in support of his position is unavailing; as he forthrightly notes, the district court's decision was reversed on this issue. (*Brown* v. *Dixon* (4th Cir. 1989) 891 F.2d 490, 496-498, cert den. 495 U.S. 953 [109 L.Ed.2d 545, 110 S.Ct. 2220].) We agree with the Fourth Circuit. (*People* v. *Edwards* (1991) 54 Cal.3d 787, 831 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

using these questions, the prosecutor obtained a "hanging jury" in violation of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] (*Witherspoon*), *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], and *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*). The trial court permitted such questions over defense objection, relying on our then-recent decision in *People* v. *Fields, supra,* 35 Cal.3d 329.

■ As we have seen, however, we have made it clear that those with scruples about imposing the death penalty are not a cognizable class, the exclusion of which violates defendant's right to a representative jury under *Wheeler, supra,* 22 Cal.3d 258. (*People* v. *Turner, supra,* 37 Cal.3d at pp. 313-315.) In addition, we have rejected the claim that to permit peremptory challenge of prospective jurors with scruples about the death penalty is to produce a jury biased in favor of death under *Witherspoon, supra,* 391 U.S. at pages 520 to 521 [20 L.Ed.2d at pages 783-784], because both parties are allowed a limited number of challenges " 'against jurors harboring specific attitudes they reasonably believe unfavorable.' " (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1263, quoting *People* v. *Turner, supra,* 37 Cal.3d at p. 315; see also *People* v. *Carrera* (1989) 49 Cal.3d 291, 331 [261 Cal.Rptr. 348, 777 P.2d 121], and cases cited.)

■ Once it is established that the prosecutor's aim was permissible, in that she was permitted to exercise peremptory challenges against those prospective jurors she suspected would be unfavorable to her case, the questions permitted to achieve that aim become a matter of the trial court's "considerable discretion." (*People* v. *Williams* (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869].) We did say in *People* v. *Williams, supra,* 29 Cal.3d at page 408, that "a question fairly phrased and legitimately directed at obtaining knowledge for the intelligent exercise of peremptory challenges may not be excluded merely because of its additional tendency to indoctrinate or educate the jury." (*Ibid.*) Many of the questions asked by the prosecutor were designed to determine prospective jurors' views regarding the legal doctrines involved in the case, including the felony-murder rule, a legitimate area of inquiry. We also note that in several instances, it was defense counsel who asked the hypothetical questions that allowed the prosecutor to exercise her peremptory challenge. While we have cautioned that such questions may improperly educate the jury on the facts and tend to compel jurors to commit themselves to a particular outcome (*People* v. *Mason* (1991) 52 Cal.3d 909, 940 [277 Cal.Rptr. 166, 802 P.2d 950]; see also *People* v. *Wright* (1990) 52 Cal.3d 367, 419, fn. 18 [276 Cal.Rptr. 731, 802 P.2d 221]), we see no prejudicial abuse of discretion in permitting the questions asked here.

■ In his reply brief, defendant seems to abandon his earlier reliance upon *Wheeler, supra,* 22 Cal.3d 285, and *Witherspoon, supra,* 391 U.S. 510. Instead, he argues that the questioning violated his right to a fair and representative jury under the Sixth and Fourteenth Amendments to the United States Constitution "not because these eight jurors formed some cognizable group within the community—but instead because each had been improperly compelled to prejudge the merits of imposing the death penalty under the 'hypothetical' circumstances of this particular case and were then excluded by prosecution peremptory based on those prejudgments." This is unpersuasive. If the excluded jurors had prejudged the case in favor of the prosecution on the basis of the voir dire questioning, defendant presumably would not want them either. If defendant is saying he is constitutionally entitled to retain on his jury prospective jurors who have prejudged *against* the death penalty, he again fails to persuade. As we have seen, the prosecutor is entitled to exercise a certain number of peremptory challenges simply on a suspicion that the juror will be unfavorable to his or her cause, and this is considered not to impair defendant's right to an impartial jury, because the defense has the same right. (*People* v. *Turner, supra,* 37 Cal.3d at p. 315.) Accordingly, defendant can hardly claim the constitutional right to retain jurors who might view the facts favorably to him at the penalty phase.

### b. *Effect on Jury*

■ In a related argument, defendant argues that the prosecutor's "pervasive" use of the facts of the case during death-qualifying voir dire permitted eight of the jurors actually selected to prejudge the facts, in violation of defendant's constitutional rights to an unbiased jury, due process of law, and a reliable determination of penalty under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16 and 17 of the California Constitution. He claims this error requires reversal of both the guilt and penalty verdicts.

Defendant complains that in her hypothetical questions, the prosecutor imputed specific intent to kill to defendant, and introduced as facts that defendant had no mental defect or diminished capacity, and that defendant had stabbed both victims. He quotes such questions as: "If you were to learn, or have a fact situation, this is purely a hypothetical, where two people set out to commit a burglary, and while they are inside a residence committing a burglary—by the way no one is at home so they do break into a residence —while they are inside the home, the owner of the residence and a friend return to the home, and burglars kill them to avoid detection or avoid the police being called. [¶] Can you envision imposing the death penalty on either one of the burglars in that particular fact situation?"

██ As we have seen, the scope of questions to be asked at voir dire is a matter for the trial court's discretion. "Under *Williams* [*supra*, 29 Cal.3d 392] the court must permit questioning about legal doctrines that are material to the trial and controversial in the sense that they are likely to invoke strong feelings and resistance to their application." (*People* v. *Johnson*, *supra*, 47 Cal.3d at pp. 1224-1225.) Certainly, we have cautioned that the trial court may limit voir dire couched in terms of the facts expected to be proved, in order to avoid the danger of indoctrinating the jury on a particular view of the facts. (*People* v. *Mason*, *supra*, 52 Cal.3d at p. 940.) ██ We have also commented that the death-qualifying voir dire should focus on juror attitudes toward the death penalty in the abstract, and should not be used to seek a prejudgment of the facts to be presented at the trial. (*People* v. *Clark* (1990) 50 Cal.3d 583, 597 [268 Cal.Rptr 399, 789 P.2d 127].)

██ Having examined the record, we think that for the most part, the prosecutor's questions were aimed at exploring the jurors' views regarding legal doctrines and the death penalty in the abstract. The question quoted above, and others like it, seem to us to be directed primarily at determining the jurors' attitudes toward the felony-murder special circumstance. To the extent that the court allowed questions laden with too many examples of facts to be proved at trial, we find no reasonable possibility that any error in permitting these questions prejudiced defendant at the penalty phase of trial, nor do we see any reasonable probability that such questions prejudiced defendant at the guilt phase of trial. (See *People* v. *Balderas* (1985) 41 Cal.3d 144, 190 and fn. 19 [222 Cal.Rptr. 184, 711 P.2d 480].)

First, in the face of hypothetical questions framed in terms of the general facts of this case, the jurors sturdily refused to be drawn into prejudging the case. They repeatedly said that they could not say how they would vote, and that they needed more facts or instruction in the law. Two who hazarded some response to the hypotheticals were noncommittal: Jurors Docken and Mackey. Two remaining jurors were asked only a single question using facts expected to be proved at trial, in the context of ascertaining their views regarding imposing the death penalty for a felony murder: Jurors Goodnight and Mitchell. Much of the questioning came from defense counsel, who presumably could phrase the questions to avoid leading the jury to prejudge the case in favor of the prosecution.[4]

Second, because these questions occurred during the sequestered portion of voir dire, the jurors only heard the questions once, and were not "bombarded with the . . . questions and instructions directed at all the other

---

[4]That defense counsel participated in the questioning would not seem to bar defendant from complaining on appeal, because counsel indulged in these questions only after the trial court denied defense motions to exclude hypothetical questioning based on the facts of the case.

panel members." (*People* v. *Balderas, supra,* 41 Cal.3d at p. 190.) Further, the court instructed the jury before voir dire that the questions were merely hypothetical, and counsel and the court reiterated this during the course of voir dire. At the beginning of general voir dire, the court instructed the jurors that they were the sole judges of the facts and that they must consider only the evidence presented in court, and the court repeated these instructions at the conclusion of the guilt phase and again at the end of the penalty phase of trial.

Finally, defendant did not indicate dissatisfaction with the jury before it was sworn, and in fact, defendant still had two individual peremptory challenges and ten peremptory challenges to be exercised jointly with his codefendant when he accepted the jury. Defendant's unexplained failure to exhaust his peremptory challenges or express dissatisfaction with the jury as seated means that he cannot complain on appeal regarding the seating of these eight jurors. (*People* v. *Morris* (1991) 53 Cal.3d 152, 184 [279 Cal.Rptr. 720, 807 P.2d 949]; *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 103 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1086-1087 [259 Cal.Rptr. 630, 774 P.2d 659].)

### 4. *Witherspoon-Witt Error*

Defendant contends that prospective jurors Barsugli and Rohletter were improperly excused for cause on the motion of the prosecutor, in violation of the Sixth and Fourteenth Amendments to the United States Constitution. Defendant argues that a juror may not be excused for cause if his or her unwillingness to vote for the death penalty in the particular case rests upon an evaluation of the evidence to be presented.

We find no error in the trial court's excusal of either juror. The record of their voir dire discloses that the trial court could properly find that they had views on capital punishment that would have prevented or substantially impaired the performance of their duties. (*Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844] (*Witt*).) In this case, substantial evidence supports the trial court's determination. (*People* v. *Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809 P.2d 865]; *People* v. *Daniels* (1991) 52 Cal.3d 815, 875 [277 Cal.Rptr. 122, 802 P.2d 906]; *People* v. *Gordon, supra,* 50 Cal.3d at p. 1262.) Each juror's reluctance to impose the death penalty was based not on an evaluation of the particular facts of the case, but on an abstract inability to impose the death penalty in a felony-murder case.

Prospective juror Rohletter said that while he had no conscientious objection to the death penalty, he would have a "hard time" imposing it in a case

involving a burglar who stabs an adult victim. He equivocated about his ability to follow the instructions and to impose the death penalty. At a lunch break, the juror reflected on his views, and came back with more sharply defined reluctance to impose the death penalty. He volunteered that: "I would find it very difficult to find a defendant guilty if the penalty would be death in a case such as this." He said unequivocally, in response to the court's question, that he could not return a guilt verdict or the death penalty in a case in which the defendant killed two victims in the course of a burglary "because I feel that the degree is not that severe. It's severe, but it's not, in my opinion, severe enough that I would be able to take, or say that I could take somebody else's life." He then affirmed unequivocally that he could not return a death penalty in a burglary-murder case regardless of the aggravating circumstances. While he said he could "consider" the death penalty in a burglary-murder case, he explained that by "consider" he meant "listen to," "take into consideration what I'm being told." He immediately thereafter unequivocally affirmed that he could not under any circumstance impose the death penalty in such a case.

The people of the State of California have determined that burglary-murder is a category of crime for which a defendant may be subject to death, depending on the circumstances. (§ 190.2, subd. (a)(17)(vii).) This prospective juror unequivocally stated his inability to follow the law in this respect. His position was an abstract one regarding the felony-murder special circumstance, not a matter of evaluating the particular facts of this case. Substantial evidence supports the implied determination of the trial court that this prospective juror was not impartial with respect to the imposition of the death penalty.

Prospective juror Barsugli, too, did not express a conscientious opposition to the death penalty in general, but did convey clearly that he could not vote for the death penalty in the case of a burglary-murder where there was no preexisting intent to kill or torture, regardless of the evidence in aggravation. He concluded that he would never vote for the death penalty in a burglary-murder case unless the killing were in fact premeditated. The trial court's decision to excuse him for cause was supported by substantial evidence. (*People* v. *Cooper, supra,* 53 Cal.3d at p. 809.)

Defendant objects that fact-based voir dire is impermissible under *Witt, supra,* 469 U.S. 412. ▆▆▆ As we have already noted, we have commented in the past that questions directed to jurors' attitudes towards the particular facts of the case are not relevant to the death-qualification process, so that a trial court that refused to permit such questions did not err. (*People* v. *Clark, supra,* 50 Cal.3d at p. 597.) We have also said, however, that "a

court may properly excuse a prospective juror who would automatically vote against the death penalty in the case before him, regardless of his willingness to consider the death penalty in other cases." (*People* v. *Fields, supra,* 35 Cal.3d at pp. 357-358.) ██ It was this language upon which the trial court in this case relied in permitting certain questions regarding the prospective jurors' attitudes toward the facts of the case. Here, the questions provided a basis for deciding something about the juror's views in the abstract; not only was each of these two jurors asked his attitude toward a case phrased in terms of the facts of this case, but the answer to these questions led to the ultimate and crucial question whether the juror could vote for the death penalty in any burglary-murder case. This was not a case like *Clark, supra,* 50 Cal.3d at page 597, where the questions about juror attitude toward evidence of the victims' burns were more appropriate to general voir dire. Rather, the questions regarding the facts of the particular case led to crucial questions and answers about the jurors' attitudes in the abstract.

██ Trial courts have broad discretion in determining what questions to permit. (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1224.) ██ We see no prejudicial error in allowing questions regarding the particular facts of the case as long as more relevant questions and answers provide the basis for the court's decision. Here, the trial court refused to excuse the prospective jurors for cause until there was a clear indication that their views about capital punishment in the abstract would substantially impair their ability to perform their duties, an appropriate exercise of discretion under *Witt, supra,* 469 U.S. 412.

### 5. *Reference to Commutation Power*

██ Defendant argues that the penalty verdict must be reversed because during sequestered voir dire of three jurors who remained on the jury, questions relating to the Governor's commutation power were asked, in violation of defendant's state and federal constitutional right to a fair and impartial jury. Putting aside the fact that it was defendant's counsel who introduced the subject in the case of two of the jurors, and putting aside defendant's failure to object to the jury as constituted or exhaust his peremptory challenges, we find no possibility of prejudice. Although we discourage questions on this subject, as we have said before, when the commutation power is mentioned at voir dire, the jury's attention is not narrowly focused on its duty to select a penalty, and the potential for prejudice is slight. (*People* v. *Walker* (1988) 47 Cal.3d 605, 627 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 769-770 [239 Cal.Rptr. 82, 739 P.2d 1250].) No "Briggs Instruction" regarding the Governor's commutation

power was given and the court properly instructed the jury that questions of counsel are not evidence, and that the jury should be bound by the evidence presented at trial and the instructions of the court. We presume absent contrary indications that the jury was able to follow the court's instructions.

B. *Issues Affecting Both Guilt and Penalty Trials*

1. *Failure to Report Sidebar Conferences*

 The trial court refused to order that every bench conference between the court and counsel be reported. Thus, 133 sidebar conferences were not reported. Defendant argues that the court's action violated his right to due process, to effective assistance of counsel, and to a fair and reliable review of the guilt and penalty determinations as guaranteed by article I, sections 7, 15, 16 and 17 of the California Constitution and by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. He also claims the court's ruling violated Code of Civil Procedure section 269 and Penal Code section 190.9.

Respondent counters that the law applicable to defendant's 1984 trial did not require the reporting of sidebar conferences, and maintains that in any case, there was no material omission in the record.

The record reflects that during the first day of testimony at the guilt phase of trial, counsel for codefendant Brown moved that all sidebar conferences be reported, complaining that he would forget any objection not recorded at sidebar. After several discussions of the point, the court ruled: "[I]t is the court's ruling that I will accept legal objections from counsel. I urge counsel not to make speaking objections, make the objections in legal terms. And when the court believes that any side bar conferences are appropriate, we will have side bar conferences. [¶] In lieu of that, we will not have side bar conferences. I have said that before. I allow them at the convenience and to aid the attorneys, but we are not going to take the reporter around every five minutes to set up a side bar conference during this trial." It is interesting to note that immediately thereafter, having reviewed the daily transcript from the day before, Brown's attorney was permitted to clarify an objection he felt was not fully reflected in the transcript. The matter was raised for the last time in the motions for new trial.

Defendant's claim that the court abused its discretion rests on Code of Civil Procedure section 269 and on Penal Code section 190.9. Code of Civil Procedure section 269 provided at the time of defendant's trial: "The official reporter . . . must . . . take down in shorthand all the testimony, the

objections made, the rulings of the court, the exceptions taken, all arraignments, pleas, and sentences of defendants in criminal cases, the arguments of the prosecuting attorney to the jury, and all statements made and oral instructions given by the judge . . . ."[5] Effective in 1985, the year after defendant's trial, section 190.9 was added to the Penal Code, requiring that in a case in which a death sentence may be imposed *"all* proceedings conducted after the effective date of this section in the justice, municipal, and superior courts, *including proceedings in chambers,* shall be conducted on the record with a court reporter present." (Italics added.)[6] Defendant's claim that the section merely restated existing law is meritless; the express language making the statute prospective only belies the suggestion. In reaching this conclusion we rely also on the explanation of the Legislative Counsel accompanying the bill (Stats. 1984, ch. 1422, § 2, p. 4994) that while existing law required the reporting of testimony and other *specified* statements, this section would require that *all* proceedings be conducted on the record, thereby imposing new costs on local government.

 ██ ██ Although sidebar and chambers discussions have long been a permissible part of the record on appeal (see *Lipka* v. *Lipka* (1963) 60 Cal.2d 472, 480-481 [35 Cal.Rptr. 71, 386 P.2d 671] [equivalent of settled statement of chambers discussion proper part of record on appeal]; see also *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1115-1116 [269 Cal.Rptr. 530, 790 P.2d 1327]), we have found no case, nor has defendant cited any, requiring that in every instance they must be reported. Code of Civil Procedure section 269, whether in its current form or that applicable at the time of defendant's trial, is not explicit on the point.[7] However, we need not determine whether the trial court erred under Code of Civil Procedure section 269, since it is so patently clear that any abuse of discretion in refusing to order the sidebar conferences reported has not prejudiced defendant, and has not impeded his ability to seek meaningful appellate review.

 As we said in a recent capital case in which defendant complained that five hours of chambers argument over a suppression motion was not

---

[5]The section since has been amended, but the amendments were essentially editorial as to this portion of the section.

[6]Defendant claims that "[i]t is well-established that section 190.9, like the preexisting statutory and case law requiring transcripts is mandatory; and even apparently trivial violations of section 190.9 may implicate due process rights." For this proposition he cites a case we ordered depublished a year before defendant filed his brief. We have been unable to discover any authority establishing that an insubstantial violation of section 190.9 or Code of Civil Procedure section 269 would implicate due process rights.

[7]Defendant does not rely on rule 39.5(c) of the California Rules of Court, specifying the record to be prepared for an automatic appeal from a death judgment, and we agree with respondent that the rule does not purport to require the trial court to order sidebar discussions reported.

reported: "Section 1181, subdivision 9 [of the Penal Code] authorizes a reviewing court to order a new trial 'because of the loss or destruction, in whole or in substantial part' of the reporter's notes. 'The test is whether in light of all the circumstances it appears that the lost portion is "substantial" in that it affects the ability of the reviewing court to conduct a meaningful review and the ability of the defendant to properly perfect his appeal.' " (*People* v. *Holloway, supra,* 50 Cal.3d at p. 1116, quoting *People* v. *Morales* (1979) 88 Cal.App.3d 259, 267 [151 Cal.Rptr. 610].) We concluded that a settled statement provided an adequate substitute for the missing transcript. (*People* v. *Holloway, supra,* 50 Cal.3d at p. 1116.)

 This is obviously not a case like those defendant cites in which the record of the trial as a whole is missing or unavailable. (See, e.g., *People* v. *Jones* (1981) 125 Cal.App.3d 298 [178 Cal.Rptr. 44] [notes of whole trial destroyed]; *In re Ray O.* (1979) 97 Cal.App.3d 136, 138-139 [158 Cal.Rptr. 550] revd. on other grounds 213 Cal.App.3d 701, 708 [no reporter's transcript of juvenile disposition hearing].) This is not a case in which a large or crucial portion of the record is missing (see, e.g., *In re Steven B.* (1979) 25 Cal.3d 1 [157 Cal.Rptr. 510, 598 P.2d 480] [stenographic notes for half of juvenile jurisdictional hearing destroyed]; *People* v. *Apalatequi* (1978) 82 Cal.App.3d 970, 973 [147 Cal.Rptr. 473] [reporter's notes of arguments of counsel lost; settled statement inadequate to raise prosecutorial misconduct argument]), or in which a crucial item of evidence is not available on appeal (compare *In re Roderick S.* (1981) 125 Cal.App.3d 48 [177 Cal.Rptr. 800] [loss of knife in possession of weapon case necessitates reversal] with *People* v. *Curry* (1985) 165 Cal.App.3d 349, 353-354 [211 Cal.Rptr. 590] [affirmance in face of loss of part of officer's probable cause statement to magistrate]). Rather, it is one in which only an inconsequential portion of the proceedings was not transcribed and has not been reconstructed. (Compare, e.g., *People* v. *Moore* (1988) 201 Cal.App.3d 51, 56 [248 Cal.Rptr. 31] [omission of defense counsel's closing arguments inconsequential].)

We are convinced that no 'substantial' portion of the record is missing in this case. The record in this appeal consists of 56 volumes of reporter's transcripts, covering 7,557 pages, 4 volumes of clerk's transcripts, covering 1,208 pages, as well as augmented clerk's and reporter's transcripts of several volumes. We have before us the reporter's transcript of the preliminary hearing, of hearings on all the pretrial motions, of voir dire, of the opening and closing arguments of the prosecutor and both defense counsel, of the testimony of every witness, and of the trial court's every word to the jury, including, of course, jury instructions. We have all the parties' pleadings and written motions, as well as the reporter's transcript of the hearing on defendant's motion for new trial, the application for modification of

sentence, and the formal sentencing. For the purpose of appeal, a settled statement was prepared, supplying the recollection of the parties and the court of the content of the unreported sidebar discussions. The parties were able to fully settle the record as to 66 sidebar discussions; as to 40 more, they recalled at least part of the discussion, and as to 27 discussions, no settled statement is provided. Of the 133 unreported sidebar discussions, 58 took place during jury selection and before the taking of testimony. To put the matter in perspective, we note that the trial extended over 53 court days. Most importantly, the trial court told counsel it was appropriate to put their objections on the record; it was only their sidebar arguments the court refused to order reported in every instance. Many sidebar conferences were in fact reported. Counsel followed the court's advice; the record bristles with hundreds of evidentiary and other objections, and the court's rulings thereon. With respect to every issue raised on appeal, we have found the record sufficient to permit review. It is in this context that we must find that any abuse of discretion, assuming it existed, was not prejudicial, because the record is clearly adequate for meaningful appellate review.

Defendant admits that he did settle the record regarding most of the 133 unreported bench conferences, but he claims that there remain disputes over several conferences involving his motion to sever his trial from that of the codefendants, voir dire, juror misconduct, admission of testimony and statements of codefendant Corona, certain hearsay objections, guilt phase instructions, prosecutorial misconduct, notice of evidence in aggravation at the penalty trial, and admission of improper evidence in aggravation. He claims that in some instances, an objection vital to preservation of an issue on appeal is not recorded because of the trial court's decision not to order the transcription of bench conferences. As it appears in our discussion of each of these issues, however, we have found the record adequate to permit our review of each claim.

Defendant asserts a constitutional basis for his claim, arguing that substantial defects or omissions in a trial record impair a defendant's Sixth Amendment right to effective assistance of counsel on appeal. He also argues that an effective appeal is impossible without an adequate record, and that an inadequate record is fundamentally incompatible with the Eighth Amendment and its requirement that there be a reliable determination whether death is the appropriate penalty.

█ Defendant argues that the burden is on the People to demonstrate that the unreported proceedings are immaterial, citing *March* v. *Municipal Court* (1972) 7 Cal.3d 422, 428 [102 Cal.Rptr. 597, 498 P.2d 437, 66 A.L.R.3d 945], and *Draper* v. *Washington* (1963) 372 U.S. 487, 499 [9

L.Ed.2d 899, 907, 83 S.Ct. 774]. However, those cases involved invidious discrimination in the preparation of transcripts on appeal. These cases were designed to vindicate the principle that indigents must be afforded "as adequate and effective appellate review as that given appellants with funds . . . ." (*Draper* v. *Washington, supra,* at p. 496 [9 L.Ed.2d at p. 906].) The high court as well as this court have said that when the grounds for appeal suggest a colorable need for a transcript of the proceedings, the burden is on the state to show that a partial transcript or some alternative method will provide as effective an appeal as is available to the wealthier defendant who can pay for the transcript. (See *Mayer* v. *Chicago* (1971) 404 U.S. 189, 195 [30 L.Ed.2d 372, 378-379, 92 S.Ct. 410]; *March* v. *Municipal Court, supra,* 7 Cal.3d at pp. 427-428.) Here there is no invidious discrimination, and the principles of these cases are inapplicable. To the extent they are instructive because they describe the importance of an adequate record on appeal, defendant misstates the burden on the prosecutor, which is not to show that any omission is "immaterial," as defendant claims, but to show that the transcript is sufficient to assure adequate appellate review.[8]

 Defendant's constitutional claims founder on our rejection of his premise that the omissions in the record are substantial.[9] They are not, even if we place the burden of proof on the People on this point as he would have us do. Rather, as we have explained, as to every issue raised on appeal, we have found the record perfectly adequate for the purpose of review; in an excess of caution, we have in one instance assumed that an objection was preserved in an unreported sidebar conference, but in every other instance we have been able to decide the issues raised without resorting to any such presumption. Finally, our review of the record convinces us that defendant's claim that there might be issues he could have raised if he had seen all the sidebar conferences transcribed is pure speculation. Therefore we must reject his claim as a matter both of federal constitutional law and state law.

### 2. *Juror Misconduct*

 Defendant argues that prejudicial jury misconduct occurred when two prospective jurors who did not serve on his jury read a newspaper article

---

[8]Defendant also argues that when the state is responsible for any defect, it is respondent's burden to show the error is harmless, citing *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. *Chapman* says no such thing; rather, it places the burden on the respondent to show that the error is harmless when the error is of federal constitutional magnitude. We find no such error.

[9]Defendant's claim that *Chessman* v. *Teets* (1957) 354 U.S. 156, 163-164 [1 L.Ed.2d 1253, 1259, 77 S.Ct. 1127], established a due process right to a particular form of record on appeal is distortion. Far from holding that the record was constitutionally inadequate in itself, the court found that the defendant's rights to due process and counsel were violated when the disputed record was settled at an ex parte hearing in which he had no voice.

about another capital trial. He claims the information they gleaned from this article may have infected the rest of the venire, in violation of his rights to due process, an unbiased jury, and a reliable determination of penalty.

The record shows that during voir dire, it came to the court's attention that prospective jurors may have read a newspaper article relating the ambivalence of capital defendant Robert Bloom toward his death sentence. The headline read: "Judge ponders sentencing of killer who says he's had a change of heart." The article reported that though Bloom had requested his jury to impose the death penalty, he actually hoped for a sentence of life imprisonment. The article noted Bloom's antagonism to the jury and to his trial counsel, and noted that Judge Albracht, who also presided in defendant's case, was considering appointing new counsel for Bloom. The article quoted Bloom: " 'Look,' he said, 'they're not going to execute me. I'll get an automatic appeal. When my case is reversed, I'll do the whole thing differently.' "

Defendant argues that the Bloom article prejudiced him by lessening the jury's sense of responsibility, undermining the gravity of the proceedings, and planting the fear that defendant might some day emerge from prison. (See *People* v. *Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669]; *People* v. *Ramos* (1984) 37 Cal.3d 136, 157-159 [207 Cal.Rptr. 800, 689 P.2d 430].) The claim is that any juror who read the article would have learned that a death sentence could be reduced to a life sentence by the trial judge, and that there was a likelihood that any death sentence would be reversed on appeal. Defendant also argues that the court failed to perform an adequate inquiry to determine whether other prospective jurors had read the article, and failed to allow counsel to question jurors in private regarding the article, making it impossible to know whether other jurors were affected by it. (See *People* v. *Adcox, supra,* 47 Cal.3d at p. 253.)

As we said recently, "[i]t is well settled that it is misconduct for a juror to read newspaper accounts of a case on which he is sitting . . . ." (*People* v. *Holloway, supra,* 50 Cal.3d at p. 1108; see also *People* v. *Hernandez* (1988) 47 Cal.3d 315, 338 [253 Cal.Rptr. 199, 763 P.2d 1289].) In fact, we have warned against the reading of " 'any matter in connection with the subject-matter of the trial which would be at all likely to influence jurors in the performance of duty . . . .' " (*People* v. *Holloway, supra,* 50 Cal.3d at p. 1108, quoting *People* v. *McCoy* (1886) 71 Cal. 395, 397 [12 P. 272].)

As the trial court found, on its face the Bloom article had absolutely nothing to do with defendant's case. However, to the extent that the article implied that a trial court could reduce a sentence of death to a life

term, or that a conviction might be reversed on appeal, it could be considered extraneous legal information that would be misconduct for a juror to consider. (See *People* v. *Marshall* (1990) 50 Cal.3d 907, 950 [269 Cal.Rptr. 269, 790 P.2d 676]; *In re Stankewitz* (1985) 40 Cal.3d 391, 397 [220 Cal.Rptr. 382, 708 P.2d 1260]; see also *People* v. *Anderson* (1990) 52 Cal.3d 453, 468 [276 Cal.Rptr. 356, 801 P.2d 1107] [jury should generally not be advised regarding availability of appeal in capital cases].)

Though a presumption of prejudice attaches to jury misconduct, we think that the presumption arising from any misconduct relating to the Bloom article is readily dispelled. (See *People* v. *Holloway, supra*, 50 Cal.3d at p. 1108.) The prospective juror who clipped the article showed it to only one other venireman. Neither man actually served on defendant's jury. Defendant's argument that the court erred in failing to inquire of the rest of the panel whether they had read the article is tenuous; since the article was found just where the prospective juror had left it in the courthouse it is speculative to argue that other jurors may have seen it. (Compare *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1175 [270 Cal.Rptr. 286, 791 P.2d 965] [insufficient evidence that one juror's misconduct tainted others to trigger duty of inquiry].)

Even if we take into account the possibility that other jurors may have read the article, we think that any such misconduct, speculative as it is, is not prejudicial. ▮▮ The presumption of prejudice may be dispelled by an admonition to disregard the improper information. (*People* v. *Cooper, supra*, 53 Cal.3d at p. 838; see also *People* v. *Holloway, supra*, 50 Cal.3d at pp. 1111-1112.) We generally presume that jurors observe such instructions. (*People* v. *Adcox, supra*, 47 Cal.3d at p. 253.) ▮▮ Here, the court admonished the entire panel to disregard the article, that the article contained errors, and that only the evidence presented at trial was to be considered. Further, the problem arose at an early stage of the proceedings, when attention was not focused on the sentence to be imposed. The problem is comparable to that presented by offhand remarks of a juror or even the prosecutor regarding the possibility of commutation that we have held nonprejudicial when they occur at the voir dire stage. (See, e.g., *People* v. *Kaurish* (1990) 52 Cal.3d 648, 709 [276 Cal.Rptr. 788, 802 P.2d 278] [juror told of early release of relative convicted of murder]; *People* v. *Walker, supra*, 47 Cal.3d at p. 627 [prosecutor asked jurors on voir dire what they thought life without parole really meant]; *People* v. *Ghent, supra*, 43 Cal.3d 739, 769-770 [prosecutor referred to commutation power in voir dire].) The misconduct alleged does not support a finding that there is "a substantial likelihood that at least one juror was impermissibly influenced to the defendant's detriment . . . ." (*People* v. *Marshall, supra*, 50 Cal.3d at p. 951.)

Accordingly we hold that the presumption of prejudice arising from any misconduct has been rebutted.[10]

 Defendant claims there was a further incident of jury misconduct when, before closing arguments of counsel at the guilt phase began, two jurors read an article in the Los Angeles Times lionizing the prosecutor in defendant's case. Among many anecdotes, it recounted how, in defendant's case, the prosecutor refused to stipulate that a photograph displayed one of the victims, and instead flew in the victim's mother, who broke down on the stand when called upon to identify the photograph. Defendant objects that the article made the prosecutor seem glamorous and successful, that it suggested that she only prosecuted guilty recidivists, and that it enhanced the poignancy of her claim that defendant was a Nazi by disclosing her own family's fate in the Nazi death camps.

Counsel for both defendants made a motion for mistrial, but the court denied the motion, explaining that it found the article at least as damaging to the prosecution as it was helpful. The court pointed out that the article characterized the prosecutor as "the master of overkill" and an "actress," as someone whose aggressiveness had won her loathing, as callous, heartless, cold, and able to win only easy cases, and as one who attempts to manipulate the jury with witnesses called only for dramatic purposes. The court assumed that all the jurors had read the article, but finding no prejudice, determined to address the problem with an admonition to the jury. The court informed counsel they could question the jurors as necessary, but without sequestration.

When the court questioned the jury about the article, it appeared that two regular jurors and one alternate had read the article. Another regular juror explained that she had only read the headline, and then asked her husband to save the article. When asked whether the article had any effect on their ability to be fair, one of the jurors who had read the article responded that her interest had been in the description of the prosecutor's wardrobe "and things of that nature." The other juror who had read the article did not respond.

The court commented that it found the article did not reflect on the guilt or innocence of the accused. It instructed those jurors who had not read the article not to do so, and instructed those who had read it to recognize that news articles contain many errors, and to decide the case solely on the basis

---

[10]Because we find the presumption dispelled, we need not reach respondent's claim that the presumption arises only when there is misconduct after the commencement of deliberations, or that defendant's failure to move for mistrial waives the claim.

of properly introduced evidence. Counsel for defendant had no further questions, while counsel for codefendant Brown unsuccessfully renewed his request for individual voir dire of the jurors who had read the article.

Respondent concedes, citing our decision in *People* v. *Hernandez, supra,* 47 Cal.3d at page 338, that to the extent the article contained any information about defendant's case, it was misconduct for any juror to read it. ▉ Indeed, as we have seen, it is misconduct for a juror to consult any material outside the record that is connected to the trial and that may influence a juror in the performance of his or her duty. (*People* v. *Holloway, supra,* 50 Cal.3d at p. 1108.) ▉ Nonetheless, we are persuaded that the presumption of prejudice is rebutted. The court admonished the jury to disregard the article. (See *id.* at pp. 1111-1112.) Further, the content of the article was innocuous. The suggestion that the prosecutor handled only recidivists would have had no effect on jurors, since defendant had already testified that he was a professional robber who had a prior conviction. Because she was prosecuting, the suggestion that the prosecutor could never *defend* a guilty person did not convey, as defendant claims, the implication that she personally believed defendant to be guilty. The description of her technique of calling the victim's mother only served to discredit her as engaging in patent manipulation of the jury. The article quoted her as saying of the incident, "the image of the tearful mother was clearly implanted in the minds of the jurors . . . . I take no chances; you never know what the jury is going to do." Finally, the information that the prosecutor had suffered personally from the Nazis and from anti-Semitism could only have raised an inference that she had a personal bias against defendant, an inference that would not enhance her prestige with the jury.

This is not a case in which the jury received inadmissible evidence relating to guilt or innocence, or received improper legal information from outside sources. Rather, the article on the prosecutor was essentially a gossipy human interest story emphasizing her glamour and aggressiveness. Far from introducing the jury to new facts or law, it explored an area the jury was peculiarly well suited to evaluate for itself; the personality and human qualities of the deputy district attorney they had been watching in action for so long. (Compare *People* v. *Marshall, supra,* 50 Cal.3d at p. 950.) Finally, as the trial court perceived, the overall impression the article created was far from favorable to the prosecutor. Considering the contents of the article, and the court's admonition to the jury to disregard it and be bound by the evidence presented at trial, we find that the presumption of prejudice is rebutted. (See *People* v. *Marshall, supra,* 50 Cal.3d at pp. 951-952.)

▉ We reject defendant's argument that the court's failure to question each juror privately regarding the impact of the article violated defendant's

rights to a fair trial and a reliable determination of penalty by an unbiased adjudicator under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and article I, section 7, 8, 16 and 17 of the California Constitution. Certainly, when there is a claim of juror misconduct, the court must conduct "an inquiry sufficient to determine the facts . . . whenever the court is put on notice that good cause to discharge a juror may exist." (*People* v. *Burgener* (1986) 41 Cal.3d 505, 519 [224 Cal.Rptr. 112, 714 P.2d 1251].) But failure to conduct a sufficient inquiry is ordinarily viewed as an abuse of discretion, rather than as constitutional error. (*Id.*, at p. 520, see also *People* v. *Adcox, supra,* 47 Cal.3d at p. 253, but see *People* v. *McNeal* (1979) 90 Cal.App.3d 830, 840 [153 Cal.Rptr. 706] [applying harmless-beyond-reasonable-doubt standard].) This is not a case in which the trial court conducted no inquiry. The court determined which jurors had read the article, asked them if their impartiality were impaired, and admonished them to disregard the article. The court also admonished the rest of the jury not to read the article and to disregard any mention of it. While individual questioning may have been preferable, we have never held that it is constitutionally required.

Further, although we do not agree with respondent that trial counsel waived the issue of jury misconduct, we do note that counsel declined the opportunity to question the jury as a group on the article. (Compare *People* v. *Burgener, supra,* 41 Cal.3d at p. 521 [defense counsel in part responsible for inadequate record regarding misconduct].) Under the circumstances, even if we were of the view that the trial court should have inquired more fully into the question of misconduct, no prejudice appears.

### 3. *Self-representation*

For a brief period that ended six months before the commencement of trial, defendant represented himself. Advisory counsel was appointed to assist him. Defendant claims the trial court erroneously granted his motion to represent himself. He claims that because there is no reporter's transcript of the hearing at which the motion was granted, and thus no record that the court advised defendant of the dangers of self-representation, reversal of the entire judgment is required.

A defendant seeking self-representation " 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." ' " (*People* v. *Bloom* (1989) 48 Cal.3d 1194, 1224-1225 [259 Cal.Rptr. 669, 774 P.2d 698].) As long as the record as a whole shows that the defendant understood the dangers of self-representation, no particular form

of warning is required. "The test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*Id.* at p. 1225; see also *People* v. *Jones* (1991) 53 Cal.3d 1115, 1142 [282 Cal.Rptr. 465, 811 P.2d 757].)

 Defendant's reliance on the deficiency of the record is misplaced. Although there is no reporter's transcript of the hearing at which the motion was granted, there is a full record of an earlier hearing that discloses the defendant was made aware of the disadvantages of self-representation. The reporter's transcript shows that on March 3, 1983, defendant moved to represent himself. The court asked if defendant thought he could save his life, and whether defendant realized the prosecutor was "trying to kill [him]." Defendant responded that he had known the stakes for over a year, and that he thought he could properly represent himself. The court informed defendant it would be difficult to represent himself while confined in jail, especially with defendant's history of difficulties following jailhouse rules. The court urged on him the advantages of keeping his counsel, explaining that counsel was trained and experienced, while defendant was not. He reminded him of his constitutional right to counsel. Defendant acknowlededged that he understood he had a right to counsel but could knowingly waive that right. The court put the matter over to permit defendant to think about his request. The clerk's transcript indicates that on March 16, 1983, the court advised defendant of his constitutional right to be represented by counsel and defendant waived the right and was permitted to proceed in propria persona. In later appearances, the court urged advisory counsel on defendant, and advisory counsel was appointed on May 24, 1983.

We are satisfied that the record of the March 3, 1983, hearing demonstrates defendant was adequately advised regarding the dangers of self-representation. Because we so conclude, we need not consider defendant's argument that the error in granting him in propria persona status was reversible per se, or that the error was prejudicial under any other standard.

 Defendant argues that during his brief period of self-representation, the court violated his rights under the Fifth, Sixth and Fourteenth Amendments to the federal Constitution and parallel rights under the state Constitution by permitting him and his former counsel to testify at a hearing on his motion to dismiss. He claims that his testimony and that of counsel provided "windfall" discovery to the prosecution regarding defendant's intention to present an alibi defense, and that the court should have excluded the district attorney before permitting such testimony.

Defendant's motion was obviously not a *Marsden* (*People* v. *Marsden* (1970) 2 Cal.3d 118, 124 [84 Cal.Rptr. 156, 465 P.2d 44]) motion, as defendant now claims, since at the time of the motion he had already removed his appointed counsel and was representing himself. Instead, he attempted to persuade the court to dismiss the case against him because of inadequate time waivers and prosecutorial misconduct, and because his previous counsel had failed adequately to investigate his defense. This was clearly an adversarial hearing that could not proceed without the presence of the district attorney to represent the interests of the state. It is true that defendant testified and called counsel to the stand, disclosing defendant's intent to produce alibi witnesses. We observe, however, that the court cautioned him about his privilege against self-incrimination and his attorney-client privilege. Any harm to defendant was self-inflicted; "[d]efendants who have elected self-representation may not thereafter seek reversal of their convictions on the ground that their own efforts were inadequate . . . ." (*People* v. *Bloom, supra,* 48 Cal.3d at p. 1226.)

C. *Issues Affecting the Trial of Guilt*

1. *Severance of Counts*

■■■ Defendant claims the trial court erred in refusing to sever count VI, the Croutch robbery, in violation of state and federal guarantees of due process and equal protection. We apply the law applicable before the adoption of Proposition 115, the "Crime Victims Justice Reform Act," at the June 5, 1990, election. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1221-1222 [283 Cal.Rptr. 144, 812 P.2d 163].) Here it is undisputed that the statutory requirements for joinder were met. (§ 954.)

The People contend that defendant waived the issue. Because of defendant's claim that the record is inadequate to permit our review of this claim, we must examine the record in detail. On January 5, 1984, five days before the commencement of jury selection, the court reopened codefendant Brown's demurrer to the complaint on the ground that it failed to allege that the special circumstances required proof of intent to kill. The court was considering amending the information to obviate the difficulty, but no decision was reached. As counsel were reviewing the information, counsel for defendant said: "Among the motions that we will make, and this will be an oral motion, at the time, we will consider a motion to sever, which I believe the court has been advised that Mr. Sussman and I are both going to make orally. Among those motions will be a motion to excise Count VI from the complaint, and I just wanted to—so it wouldn't come as any shock, and the basis will be Count VI, which was isolated from the other counts in

Count V, bias and prejudice, but I wanted to advise at this time, at least, the court and the district attorney, that we will be making that motion at the proper time." Then codefendant Brown made a motion to sever his trial from that of defendant. Defendant responded, "because of the fact we late announced that we were going to sever Count VI from the complaint, and from something Mr. Dettmar kindly reminded me of, I would respectfully move the court to allow us to make our motion to sever Mr. Pinholster from Mr. Brown as well as sever count VI until a later time, presumably Monday morning. [¶] We want to look into it, and it's something that later occurred to my esteemed associate . . . . " The court responded: "Fine. I have no problem with that. I would withhold a ruling on the argument currently pending before this court made by [codefendant] and will allow counsel to address more fully and completely the motion to sever on Monday." On Monday, the matter was continued to Tuesday, January 10, when codefendant renewed his motion to sever his case from defendant's, or at least empanel two juries. Defendant argued against the empanelment of two juries, and referred tangentially to his desire to sever his case from the codefendant's. He said nothing about severing count VI. The court denied the motion for severance and for separate juries, and then indicated that they would go off the record for a moment. The record discloses no further discussion of or ruling on any motion to sever counts.

We agree with respondent that the above record discloses a failure formally to move for severance of the count and to press for a ruling on the issue, a failure that constitutes a waiver of the issue on appeal. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 77-78 [241 Cal.Rptr. 594, 744 P.2d 1127].) Defendant claims it is "highly likely" he renewed his motion at the unreported sidebar conference noted above, though there was no settled statement regarding this sidebar discussion. We see no basis for this optimism, but conclude that even if the issue were properly preserved, any error in the court's failure to sever count VI was clearly harmless.

There was overwhelming evidence of defendant's guilt on the other charges. Corona was present at the scene and his testimony described defendant's homicides in detail; his testimony was corroborated by the discovery of defendant's palm print in the house and of the bloodstained items in defendant's apartment, and also by the testimony of several witnesses regarding defendant's conduct before and after the crimes. There was ample evidence of defendant's intent to rob Kumar from the testimony of Lisa Tapar and Charles Kempf, as well as from defendant's own testimony. Nor was the evidence of the Croutch robbery inflammatory compared to the evidence of the double homicide. Rather, defendant himself used the Croutch robbery in his defense, claiming to be a frank robber who used a handgun

rather than a burglar who would kill people. This was not a case where joinder bolstered a weaker case with strong evidence of guilt in another case. It is not reasonably probable that a result more favorable to defendant would have been reached if the Croutch robbery had been severed. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see also *People* v. *Bean* (1988) 46 Cal.3d 919, 940 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Miranda, supra,* 44 Cal.3d at p. 78.)

### 2. *Severance of Defendants*

 Defendant contends the trial court abused its discretion and violated his right to due process when it denied his motion to sever his trial from that of codefendant Brown. At the hearing on the motion, defense counsel was not precise in arguing that joint trial would be prejudicial. He said: "But at the beginning when I first got into the case, I was anxious to make a motion to sever because Mr. Pinholster has enough to encounter in this case without hearing the other evidence that might come in with regard to Mr. Brown that might not be present in an independent trial. [¶] I don't know exactly what I am talking about there because I don't know what the defenses would be, but it's a principle that we have to be conscious of." He also argued that the district attorney's decision to seek the death penalty against him but not against Brown would prejudice him.

 There is a statutory preference for joint trial of jointly charged defendants. (§ 1098.) "A 'classic' case for joint trial is presented when defendants are charged with common crimes involving common events and victims." (*People* v. *Keenan* (1988) 46 Cal.3d 478, 499-500 [250 Cal.Rptr. 550, 758 P.2d 1081].) Though severance is in the sound discretion of the trial court, severance should generally be granted " 'in the face of an incriminating confession [by a codefendant], prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.' " (*Id.* at p. 500, quoting *People* v. *Turner, supra,* 37 Cal.3d at p. 312; *People* v. *Massie* (1967) 66 Cal.2d 899, 917 [54 Cal.Rptr. 733, 428 P.2d 869].) Whether it is an abuse of discretion to deny severance depends on the facts as they appear at the time of the hearing on the motion. (*People* v. *Boyde* (1988) 46 Cal.3d 212, 232 [250 Cal.Rptr. 83, 758 P.2d 25], overruled on another point *sub nom. Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 361].)

 No facts before the trial court indicated that any of the above grounds for severance existed in this case. There was no evidence of sharply antagonistic defenses, and no indication that Brown would testify against

defendant or that he had made incriminating statements that would prejudice defendant. Separate trials would have consumed a great amount of scarce judicial resources, and defendant did not demonstrate the kind of substantial prejudice that would justify such an expenditure.

Defendant contends evidence that Brown's association with the Aryan Brotherhood would be prejudicial. However, defendant points to voir dire questions and evidence at trial to substantiate this claim, and obviously the trial court could not have considered this at the time of the hearing. There was preliminary hearing testimony, though certainly no one argued this to the court, that Corona was afraid to go to the police because of Brown's Aryan Brotherhood connection. This evidence would tend to make Brown appear to be the more violent of the two men, and arguably the ringleader. Because this evidence might be more useful than prejudicial to defendant, it would not compel the severance of the two men's trials.

Defendant also refers to voir dire questions and statements of Brown's counsel in arguments to the jury suggesting that Brown would concede defendant's guilt. Again, the statements relied on were not before the court at the time of the motion; even regarding the threat of such statements as inevitable at the time of the hearing, we have made it clear that a defendant's natural tendency to shift blame onto a codefendant is not in itself a sufficient ground for severance. (*People* v. *Turner, supra,* 37 Cal.3d at pp. 312-313.)

██ "After trial, of course, the reviewing court may nevertheless reverse a conviction where, because of the consolidation, a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." (*People* v. *Turner, supra,* 37 Cal.3d at p. 313.) ██ Defendant's references to the evidence relating to the Aryan Brotherhood and to codefendant's arguments to the jury may be understood to raise such a claim. As we have said, the efforts of codefendants to shift blame onto each other are not inherently prejudicial. Here, codefendant Brown's argument simply was that while there was ample evidence of defendant's guilt, the evidence was shakier as to Brown's guilt. This argument barely emerged in Brown's opening argument. It was raised in Brown's closing argument, but the argument was technical. Brown's counsel suggested that Art Corona's statement had been corroborated as it implicated defendant, but not as it implicated Brown. Defendant's complaint that Brown urged the admission of the Corona statement to the police cannot be counted a "gross unfairness," since, as we have seen, defendant himself did not object to the admission of the evidence.

Further, any suggestion that Brown was innocent even if defendant were found guilty came from arguments of counsel, rather than from testimony or

out-of-court statements of Brown. This reduced the prejudicial impact of Brown's attempt to shift blame onto defendant. (Compare *People* v. *Massie*, *supra*, 66 Cal.2d at p. 919 [codefendant's confession implicates defendant].) Finally, the two codefendants did not have completely inconsistent defenses; both claimed alibis depending in part on the same evidence of a party at defendant's apartment complex, and Brown simply claimed that the reasonable doubt of his guilt was greater than the reasonable doubt of defendant's guilt.

As for the claim that evidence of Brown's Aryan Brotherhood connection prejudiced defendant, the theory that the jury would be convinced of defendant's guilt because of tangential evidence that his codefendant was associated with the Aryan Brotherhood is untenable under the state of the evidence in this case.

### 3. *Improper Admission of Evidence*

#### a. *Corona Tape*

The court permitted to be played to the jury a tape recording of prosecution witness Corona's interview with the police. In this interview, Corona recounted the events that culminated in the two murders with which defendant was charged. In passing, Corona alluded to defendant's prior robberies and drug activities, mentioned that defendant knew people in the Aryan Brotherhood, and said that he had heard that defendant was involved in an incident in which two people died.　██　Defendant contends this inadmissible hearsay prejudiced him and its admission into evidence requires reversal of the judgment because it violated his state and federal constitutional rights to confront witnesses, to a fair trial, and to a reliable sentencing determination.

Defendant concedes that there is no objection on the record to the admission of this evidence, but contends that an objection must be presumed, in part because of the trial court's refusal to order that all sidebar conferences be reported. However, we have examined the reporter's transcript and the parties' settled record regarding the untranscribed sidebar discussions, and see absolutely no indication that defense counsel objected to the admission of this evidence. As we have already noted, the court directed counsel that although it would not order the transcription of all sidebar conferences, counsel would be permitted to make all their objections on the record.

We agree with respondent that not only did defense counsel not object, the record shows that they desired the evidence to be presented. Counsel collaborated with the prosecutor in drafting a transcript of the recording, and did

not demur when the prosecutor said that she presumed they all wanted the tape played. Most significantly, at the conclusion of Corona's testimony, when the prosecutor moved to play the tape, the court asked: "Is it the intention of all parties that we should play this tape?" Counsel for defendant responded: "No objection." There was some discussion of errors in the transcription, but no suggestion whatever that defense counsel had moved to edit any prejudicial material out of the transcript or that they objected in any way to the playing of the tape. The jury was told to use the transcript of the recording, which defense counsel had helped prepare, as an aid.

Counsel did not object to supplying the jury with the transcript during deliberations, and the following exchange gives an indication that the trial court understood that there were tactical reasons for the decision to allow the tape to be played: "The Court: . . . I think at the time we discussed that, at the time it was received into evidence, it was my understanding that neither side objected, and as a matter of fact there was material in there that the defense believed was important to them, and everyone, at that point in time, at least agreed that the transcript was a joint effort, transcribing those notes by the prosecution and defense, was advantageous to both sides and it was received in evidence without objection. [¶] Mr. Dettmar [defendant's counsel]: I have just had a chance to discuss with Mr. Brainard [cocounsel], and it was his recollection, too, so apparently there will be no objection as to Mr. Pinholster." Finally, at the close of the prosecutor's case, when she formally moved all the items marked for identification into evidence, counsel for the defendants were directed to note their objections to any items, with the assumption that "any items not mentioned by the defense shall be admitted without objection . . . ." There was no objection to the tape or the transcript and therefore it was admitted. Counsel also did not object to the replaying of the tape to the jury during deliberations.

 "It is, of course, 'the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' " (*People* v. *Poggi* (1988) 45 Cal.3d 306, 331 [246 Cal.Rptr. 886, 753 P.2d 1082], quoting *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].) Defendant counters that any failure to object necessarily was ineffective assistance of counsel, in violation of state and federal constitutional guaranties.

 Defendant's burden is to show that counsel's performance was deficient and that the deficiency prejudiced him. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-689 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216, 217 [233 Cal.Rptr. 404, 729

P.2d 839].) " 'Reviewing courts will reverse on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People* v. *Cox* (1991) 53 Cal.3d 618, 659 [280 Cal.Rptr. 692, 809 P.2d 351], quoting *People* v. *Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144].)

Here, a rational tactical reason appears for counsel's choice; the defense theory, and indeed defendant's testimony, was that he was a professional and accomplished robber of drug dealers who always used a firearm, not a bungler who would use a knife and associate with a knife-wielding burglar like Corona. (Compare *People* v. *Cox, supra*, 53 Cal.3d at p. 660 [tactical reason for defense counsel to elicit evidence of defendant's gang activity].) He needed to create an impression of candor to carry his testimony that he had broken into the Kumar house on the night of the murder, but had stolen the drugs and left before Corona arrived and stabbed the murder victims. Accordingly, his own testimony recounted his violent criminal past; the Corona tape, in its passing comments on defendant's exploits, simply confirmed what defendant was willing to say about himself. The reference to defendant's knowledge of people involved in the Aryan Brotherhood was clearly innocuous, since Corona testified that it was Paul Brown who was affiliated with the Aryan Brotherhood and that it was Brown, not Pinholster, that Corona feared.

Further, the tape contained statements inconsistent with Corona's trial testimony, showed Corona's eagerness to cooperate with the police, and contained some reference to Corona's contact with one "Butch," who defendant claimed was Corona's actual accomplice. All these factors made the playing of the tape advantageous to defendant. In fact, defense counsel made use of it in closing argument. On this record, we find no ineffective assistance of counsel.

### b. *Quartararo Testimony*

Gian Norelli, a defense witness, testified that he was present when the abortive plan to rob Kumar was discussed, and that Kempf, not defendant, was the ringleader. The prosecutor attempted to impeach Norelli with his inconsistent statement to Detective Quartararo, and Norelli repeatedly claimed that he could not remember what he had told the detective. In particular he was asked whether he had told Quartararo that he thought defendant guilty, that defendant had asked him to lie, and that he had overheard defendant admitting the killing to a third party. Norelli testified that he remembered talking to the officer, but that he could not remember making these statements.

Detective Quartararo was permitted to testify as a rebuttal witness that Norelli had told him all about the abortive plan to rob Kumar. In addition, Quartararo said that Norelli said that he thought defendant had done the murders, that he had overheard defendant say he had knifed two people in Tarzana, and that defendant had asked Norelli to lie for him about defendant's involvement in the Kempf incident. When asked why Norelli would testify that he did not remember these statements, the detective was permitted to testify as to his opinion that Norelli was afraid of defendant.

 Defendant contends that Quartararo's testimony was inadmissible hearsay and opinion evidence, and that its admission violated Evidence Code section 352, and his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and their "parallel" provisions in the California Constitution. Respondent argues that any objection beyond the hearsay objection was not preserved for appeal.

The trial court stated for the record that "there was an objection to the testimony of the officer, as well as reference to the document [the detective's notes of the interview.]" The court referred to a sidebar conference on the matter that was unreported. The settled statement indicates that the subject of the unreported conference was defendant's hearsay objection, and that beyond this, counsel were unable to add to the information provided in the reporter's transcript. Because it was the court's ruling on reporting sidebar conferences that created some deficiency in the record on this point, we will assume that counsel properly preserved objections to the evidence on the grounds raised here.

We find Norelli's statements that defendant told Norelli to lie for defendant, that Norelli had overheard defendant tell Steven Crane defendant had stabbed two people at Kumar's house, and that Norelli thought defendant was guilty, were admissible as prior inconsistent statements. On cross-examination, Norelli had claimed he was unable to remember making these statements to Quartararo. Given Norelli's pattern of deliberate evasions on cross-examination, the prosecutor was entitled to prove that the statements were made through a prior inconsistent statement. (*People* v. *Green* (1971) 3 Cal.3d 981, 988-989 [92 Cal.Rptr. 494, 479 P.2d 998]; Evid. Code, §§ 770, 1235.) Our review of the record persuades us that Norelli was deliberately evasive; a prior ruling on the record to that effect by the trial court is not a condition precedent to our holding that the statements were admissible as a prior inconsistent statement. (See, e.g., *People* v. *Plasencia* (1985) 168 Cal.App.3d 546, 551 [223 Cal.Rptr. 786]; *People* v. *Burciago* (1978) 81 Cal.App.3d 151, 165 [146 Cal.Rptr. 236].) Further, defendant's right of confrontation was not impaired; the declarant was subject to examination at

trial and admitted making a statement to the detective. The jury could evaluate Norelli's demeanor, and defendant had the opportunity to examine him fully regarding his statements to the detective. (See *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930]; *People* v. *Green, supra,* 3 Cal.3d at pp. 989-990.) Nor can we agree with defendant's conclusory claims that the evidence was more prejudicial than probative under Evidence Code section 352, or that its admission violated the laundry list of constitutional provisions defendant notes in passing.

 Respondent concedes it was error to admit the testimony that Quartararo was of the opinion that Norelli was afraid of defendant. We agree with respondent, however, that any error was not prejudicial. Norelli was not the only one who was afraid of defendant, as the evidence that defendant had threatened to "blow up" Corona reveals.

### c. *Coercive Plea Bargain*

 Defendant contends the terms of the prosecutor's plea bargain with Art Corona were coercive, so that Corona's testimony should have been excluded as unreliable. (See *People* v. *Garrison* (1989) 47 Cal.3d 746, 767 [254 Cal.Rptr. 257, 765 P.2d 419]; *People* v. *Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133].) He claims a violation of state and federal due process guaranties. He argues that given the history of Corona's cooperation with the police, the agreement should be understood to have impermissibly required Corona to adhere to his prior statements without regard for their truthfulness, and to testify in such a way as to assure defendant's conviction.

The complaint in this case named Corona as well as defendant and Brown in each count except the Croutch robbery. Just before the preliminary hearing, Corona's case was severed. He waived preliminary hearing and testified against defendant and Brown, denying then and at trial that he had been offered or promised leniency in return for his preliminary hearing testimony. His attorney was called as a witness at the preliminary hearing and testified that he and the prosecutor had discussed what might happen if Corona testified. However, the attorney successfully invoked the attorney-client privilege with respect to the content of those discussions. Seven days later, the prosecutor wrote to Corona's counsel, setting forth the offer defendant now complains of as coercive: "It is my belief that Mr. Corona will testify completely and truthfully at any and all trials in this matter. At the conclusion of all such trials the People agree to dismiss Counts I, II, IV, and V as to Mr. Corona and to amend the information to allege a violation by him of Penal Code section 32. He would then plead guilty to this charge as well as to Count III, the burglary. [¶] The reasons the murder and robbery

charges against Mr. Corona will be dropped are twofold: First and foremost, the evidence clearly shows that he did not participate or aid and abet in the killing or robbery of the victims. Secondly, realistically, I believe we need Mr. Corona's testimony to ensure the successful prosecution of the two actual murderers and, even though Mr. Corona has already testified at their preliminary hearing without any 'deals' or promises having been made to him, the fact that he did so and is willing to do so in the future—at a very substantial risk and danger of death to himself and his wife—merits considerable consideration. [¶] I trust you and Mr. Corona will be agreeable to this arrangement."

During voir dire, defendant moved for discovery of any prosecution agreements with Corona. The court granted the motion. Defense counsel stated that with regard to Corona "in reading the preliminary hearing transcript, you get the feeling that there is a deal, but Mr. Corona may not have been fully informed of it by his attorney, although I'm sure [Corona's counsel] had discussed the matter with the district attorney." The prosecutor responded: "I represent to the court, as an officer of the court, with respect to Mr. Corona, the only discussions are those that are contained in the letter which was sent to his attorney . . . ."

The claim that the prosecutor's offer to Corona was coercive is specious. We have said that a condition that the accomplice testify truthfully is not coercive. (*People* v. *Andrews* (1989) 49 Cal.3d 200, 231 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Garrison, supra,* 47 Cal.3d at pp. 769-770.) The agreement clearly was not conditioned on defendant's conviction. While the prosecutor's letter explained why the prosecution needed Corona's testimony, it imposed no condition on that testimony. The explanation was probably aimed at allaying Corona's counsel's fear that a trial court might reject the bargain being offered to his client.

Defendant claims that Corona's police interrogator told him that if he changed his story, he would be "hung out," and that only his statement to the police would "mean anything." He claims that Corona therefore must have understood that the bargain offered by the prosecutor was conditional on his not changing his story. But the prosecutor's offer itself simply does not bear such a construction, and the context of the interrogation does not support the claim that any kind of bargain was struck at that time.

### 4. *Failure to Disclose Evidence*

The prosecutor has a duty, founded on due process, to disclose substantial material evidence favorable to the accused, including matters

relating to the credibility of witnesses and inducements made to secure their testimony. (*People* v. *Pensinger, supra,* 52 Cal.3d at pp. 1271-1272.) "Under the federal Constitution, 'the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.' " (*Id.* at p. 1272, quoting *United States* v. *Bagley* (1985) 473 U.S. 667, 678 [87 L.Ed.2d 481, 491, 105 S.Ct. 3375].)

 Defendant claims the prosecutor's failure to disclose certain elements of the plea bargain offered Corona was a violation of due process that requires reversal. He points to indications that the prosecution and the police had conversations with Corona before the preliminary hearing, arguing that this controverts the prosecutor's statement that the first discussion of a plea with Corona's counsel was her letter offering the deal. Though the record does show, as defendant claims, that Corona had contact with the police and the prosecutor before the preliminary hearing, defendant can point to no evidence that any leniency or inducements to testify were offered then. Corona's attorney stated at the preliminary hearing that he had discussed what might happen to Corona with the prosecutor before the hearing, but there was no indication that any agreement was reached or that any inducement was conveyed to Corona—quite the opposite.

Defendant claims that the prosecutor failed to disclose that the police offered protection for Corona's wife, and that when Corona consented to have his house searched in connection with the murder, the police reassured him he would not be prosecuted for any "dope" found there. Neither of these are in any way substantial inducements to testify, and in any case, they were contained in the tape and transcript of Corona's interview with the police, a document defendant had in advance of Corona's testimony. Art Corona's request for protection for his wife came out at the preliminary hearing, as well. Neither does Casey Corona's trial testimony that the prosecutor helped her get into a drug treatment program show any connection with Corona's plea bargain, and in any event, defendant could have recalled Corona for further cross-examination when the evidence came to light.

In sum, defendant provides no evidence on this record that the prosecutor failed to disclose inducements offered to Corona for his testimony.

 Defendant also claims the prosecutor breached her duty in failing to disclose the identity of five witnesses in a timely manner, and he also may be understood to claim the prosecutor failed to comply with the discovery order in the case.

 The claim is meritless. The prosecutor resisted discovery of the identity of three informants, but when the court ordered disclosure, she

complied, providing their identities and her notes of their statements to her investigator, as well as the investigator's report on the conversations. None of the informants testified for the prosecution. One of them, Gian Norelli, testified for defendant. Defendant claims that he would have profited by earlier disclosure of Norelli's statements, but in fact, the disclosure was timely and defendant had ample time to investigate Norelli's statement before deciding to call him as a witness. After all, jury selection did not begin until about a month after compliance, and the evidentiary portion of the trial began almost two months later.

 Two other witnesses were not disclosed to defendant until the middle of trial. Each was to be called to testify to Art Corona's prior consistent statements in an effort to rebut defendant's suggestion that Corona's testimony was a fabrication. Thus, it is almost impossible to argue that they could have provided evidence favorable to the accused. In any case, one, Connie Pangburn, was never called to testify. The prosecutor asserted that she only learned a few days earlier that Art Corona had made consistent statements to Pangburn, since the witness earlier had resolutely refused to become involved. The court offered counsel a reasonable amount of time to investigate the new evidence. It is inconceivable that any delay in disclosing her identity could have affected defendant, since Pangburn did not testify.

The other late-disclosed witness was Caesar Corona, Art Corona's brother. He did testify against defendant, and corroborated Art Corona's testimony with evidence of a prior consistent statement. The prosecutor claimed she did not disclose Caesar Corona's identity and statement because "it was never considered it would be relevant." While we may share defendant's skepticism at this statement, again, we fail to see how any delay in disclosing this witness harmed defendant. The court gave defendant ample time to investigate once the witness and his proposed testimony were disclosed. The court said: "I'll give you as much time as you want. You name it, you've got it. Investigate it fully, research it fully." The defense requested no continuance. It is defendant's burden to show that the failure to timely comply with any discovery order is prejudicial, and that a continuance would not have cured the harm. (*People* v. *Reyes* (1974) 12 Cal.3d 486, 502 [116 Cal.Rptr. 217].) There is no suggestion that the defense would have been different had defendant been aware of Caesar Corona's testimony before trial. As a matter of due process there was no suppression of material evidence favorable to the accused, and any failure to timely disclose the witness was harmless and did not undermine the reliability of the proceedings. (See *People* v. *Pensinger, supra,* 52 Cal.3d at pp. 1273-1274.)

### 5. *Prosecutorial Misconduct*

Defendant charges the prosecutor with multiple acts of misconduct. We begin our discussion with the observation that: "It is, of course,

the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. . . . It is true that the rule does not apply when the harm could not have been cured." (*People* v. *Benson* (1990) 52 Cal.3d 754, 794 [276 Cal.Rptr. 827, 802 P.2d 330]; see also *People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468].)[11]

### a. *Gang Membership*

■■■ Defendant complains that the prosecutor suggested, through improper voir dire, opening statement, questions to witnesses, and closing argument, that he was a member of a prison gang, the Aryan Brotherhood. Absent some connection between the prison gang and proof of the charged offenses, of course, a prosecutor's reference to prison gangs is irrelevant and prejudicial. (*People* v. *Cox, supra,* 53 Cal.3d at p. 660; *People* v. *Malone* (1988) 47 Cal.3d 1, 30 [252 Cal.Rptr. 525, 762 P.2d 1249].) The prosecutor disclaimed any intent to introduce the prison gang theme into her case and, indeed, the trial court announced that it would not permit her to introduce such evidence without a showing of its relevance.

We agree with respondent that it was defense counsel who introduced the theme in voir dire. The defense had requested that questions on this sensitive topic be permitted, in response to the obvious potential that some evidence of Nazi symbols or the Aryan Brotherhood would be introduced at trial. It was in response to defense questions about the Aryan Brotherhood that the prosecutor asked whether jurors had heard of that group. She asked one juror, after defense questioning on the point, whether she would favor the defense if the evidence showed that the defendants were associated with the swastika or the initials "S.S." She asked another juror, who told defense counsel he could not be fair in light of any involvement in a Nazi gang, whether he could be fair if the Nazi symbols had nothing to do with the murders. The juror was excused for cause. Further, in none of these instances was there any defense objection or request for admonition.

Contrary to defendant's claim, there was no reference to prison gangs in the prosecutor's opening statement; her statement that defendant scratched a swastika on a car after an altercation with its owner carried no such message

---

[11]Defendant claims only one instance in which there was an unreported sidebar conference that related to a claim of prosecutorial misconduct. It occurred near the end of the prosecutor's summation at the guilt phase. After the summation, defense counsel put on the record their objection that the argument appealed to passion and prejudice, and suggested that defendant was so guilty that he did not deserve a trial. The settled statement shows that the unreported conference involved the same objection.

and was a proper statement of the evidence to be adduced. In any case, there was no objection to the comment, and so the claim is waived.

■ Defendant complains also of various questions posed by the prosecutor to witnesses, invoking the rule that it is misconduct for a prosecutor to " 'intentionally elicit inadmissible testimony.' " (*People* v. *Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217].) Prosecution witness Kempf recounted his involvement in defendant's unconsummated plan to commit a robbery at the Kumar home. On cross-examination, Kempf revealed that he had testified against the brother of another participant in the plan, one Bob Crane. On redirect examination, the prosecutor asked questions intended to rebut defense questioning suggesting that Kempf was a professional informant. She asked whether he knew that Bob Crane was the head of the Aryan Brotherhood. We see no prejudice, since the defense objection was sustained, the court directed that there be no further references to the Aryan Brotherhood, Kempf did not answer the question, and the jury was instructed to disregard the question. (See *People* v. *Warren* (1988) 45 Cal.3d 471, 482-483 [247 Cal.Rptr. 172, 754 P.2d 218].)

■ Defendant charges that the prosecutor improperly questioned her own witness, Charlie Kempf, by asking whether he knew both defendant and Bobby Crane. There was no objection, and we fail to see how this could possibly have suggested to the jury that defendant was involved with a prison gang. Defendant himself volunteered that he didn't like Kempf because he had testified against Bobby Crane.

Defendant complains the prosecutor suggested his affiliation with prison gangs when she asked him on cross-examination whether he knew what Bobby Crane was incarcerated for and asked: "He is head—he's a pretty powerful person in San Quentin, is he not, sir?" But defendant's objection to this line of questioning was sustained, so we see no possibility of harm to defendant.

■ Defendant also complains that the prosecutor purposely elicited reference to prison gangs when she asked Art Corona what he talked to codefendant Brown about when they first met, and Corona said: "I remember some conversation about different guys that were in prison affiliated with A.B., Nazis, whatever." There was neither an objection to this question nor a request for admonition, nor do we see any indication that the prosecutor asked the question for the purpose of eliciting an improper answer (see *People* v. *Bonin, supra,* 46 Cal.3d at pp. 689-690; *People* v. *Warren, supra,* 45 Cal.3d at pp. 482-483).

Defendant also objects to the prosecutor's attempt to rehabilitate Corona on redirect examination. The defense had pointed out inconsistencies in

Corona's statement to the police and his trial testimony, including his failure to tell the police what Brown had said about stabbing one of the victims. On redirect examination the prosecutor showed that Corona failed to tell the police what codefendant Brown had said because he was afraid of Brown, believing that Brown was affiliated with the Aryan Brotherhood. This was arguably proper evidence rebutting a claim that the witness was fabricating his testimony. (*People* v. *Adcox, supra,* 47 Cal.3d at p. 237.) In any event, there was neither an objection on the grounds of misconduct nor a request for admonition, and the evidence did not suggest that *defendant* was a member of any gang.

In a related claim, defendant argues it was misconduct for the prosecutor to elicit evidence that defendant had scratched Nazi insignia on a witness's car. He fails to establish that the evidence was inadmissible. As we have seen, the prosecutor called Lisa Tapar, who testified that defendant arrived at her house after midnight on the night of the murders, and that when she denied him admission, he stabbed her front door and vandalized her car with a knife. The evidence was relevant to show his possession and use of a knife at a relevant time, as well as to corroborate Corona's statement regarding the time of the visit and his report of defendant's vandalism of Tapar's car. Tapar did not see defendant scratching symbols on her car, so it was necessary for the prosecutor to establish that defendant had done so circumstantially, by asking what marks Tapar had discovered on her car and whether they had been there before defendant's nocturnal visit: "What kind of marks were there on your car? A: Swastika, S.S.B. and S.S. or lightning bolts. Q: Lightning bolts? Now what are lightning bolts? A: I think it has something to do with the Nazis." Not only was the evidence relevant, there was neither any objection to its admission, nor any unreported sidebar discussion at or near the time of these questions. The issue, such as it is, is waived.

Defendant also complains of questions the prosecutor asked him. Defendant admitted his visit to Lisa Tapar. He explained that he visited to give her some money and to tell her of the death of his friend, "Shotgun," and not to ask her about Kumar's address. Attempting to impeach this story, the prosecutor asked: "Why did you go over and scratch Lisa's car? A: I do that quite often." She asked him what he had scratched on the car, and he said he had written his nickname and the initials S.F.V., which meant San Fernando Valley. She pursued the subject: "What else did you scratch on that car, sir? A: Probably a swastika. Q: What do you mean, probably? A: I commonly do that. Q: Why do you commonly scratch swastikas on things? A: Symbolizing white power. Q: Are you an advocate of white power, sir? A: Yes. Q: Do you belong to a group that advocates white power? A: No, I do

not. Q: So you would scratch a swastika. What else did you scratch on there, sir? A. To the best of my recollection, I think that's all I put there." She showed him a photograph, and asked what else it showed. He answered, "Two sets of lightning bolts. Q: What are those lightning bolts, sir?" The court interrupted, called the noon recess, and put on the record its concern that the questions would lead to evidence of prison gang affiliation, as to which there had been an objection. The court questioned the relevance of the evidence. The prosecutor explained that she did not expect to elicit evidence of gang affiliation, but of defendant's belief in White power. The court concluded: "As I say, at this point in time, I don't believe that any potential or alleged prison gang or outside-of-prison gang affiliation is relevant."

The court effectively precluded the prosecutor from pursuing questioning that would elicit evidence of gang membership, and we see no possibility of prejudice from the questions that were asked. The prosecutor never claimed that defendant was not a credible witness because he believed in White power, or that his prejudices were probative of his guilt. The issue was simply irrelevant.

 Finally, we conclude that to the extent the jury would have understood any of the evidence or questions complained of here as alluding to prison gang membership, there could not have been any prejudice to defendant. Even assuming that in each instance the issue was properly preserved for appeal, and assuming the jury understood the evidence as being relevant to defendant's activities, as opposed to Brown's, we see no prejudice. Evidence of gang membership is considered prejudicial because it tends to establish criminal disposition. (*People* v. *Cardenas* (1982) 31 Cal.3d 897, 905 [184 Cal.Rptr. 165, 647 P.2d 569].) Here, defendant himself made his criminal disposition clear. In fact, he gloried in it.

b. *Threats*

 Defendant claims the prosecutor committed misconduct in eliciting testimony from Todd Croutch that he had received a threatening phone call from defendant, who said that if Croutch testified, he would be killed. The claim is untenable; such evidence is clearly admissible to show consciousness of guilt. (*People* v. *Hannon* (1977) 19 Cal.3d 588, 599-600 [138 Cal.Rptr. 885, 564 P.2d 1203]; *People* v. *Slocum* (1975) 52 Cal.App.3d 867, 887 [125 Cal.Rptr. 442].) Questions regarding the reliability of Croutch's identification of the voice as defendant's went to the weight, not the admissibility, of the evidence. Similarly, the prosecutor was entitled to probe defendant about the threats, and to ask Casey Corona whether she had received "threats from either of the defendants." The jury was admonished to

disregard her nonresponsive answer that she had received a threat from defendant's brother. Given the form of the prosecutor's question, we see no evidence the prosecutor intended to elicit inadmissible evidence. (See *People v. Warren, supra,* 45 Cal.3d at pp. 482-483.) She later readily complied with the court's warning that she should not ask any questions along these lines unless she knew the answer was admissible, choosing to abandon the line of questioning.

■■■■■ With regard to questions of Detective Quartararo whether he had an opinion as to why Gian Norelli did not remember his conversation with Quartararo, the questions called for improper opinion testimony, as respondent would agree. The officer replied that "I believe he is afraid of Mr. Pinholster." The court overruled defendant's evidentiary objection, but any error, whether characterized as evidentiary or as prosecutorial misconduct, is clearly harmless. The jury was already aware of defendant's violent threats against Corona. For the same reason, any error in asking Quartararo why he had moved Corona around from jail to jail, eliciting the answer that Corona "had received some threats at the county jail," was harmless.

### c. *Prior Violent Acts*

■■■■■ Defendant argues the prosecutor improperly brought before the jury evidence of defendant's prior uncharged violent acts. Of course, such evidence would be subject to exclusion under Evidence Code sections 1101 and 352; no objection on those grounds appears. Defendant fails even to argue that the evidence complained of was inadmissible. He also fails to show that the prosecutor anticipated the witness's answers and purposefully elicited them. (See *People v. Bell* (1989) 49 Cal.3d 502, 532 [262 Cal.Rptr. 1, 778 P.2d 129]; *People v. Bonin, supra,* 46 Cal.3d at p. 689.)

Taking the points separately, he objects to a question posed to Art Corona on redirect examination, asking why he had said in his statement to the police that he thought that if defendant were not arrested, he, Corona, would be held solely responsible. Corona answered: "Well, it was one time before this happened, Scott had told me about a shootout he had gotten into in the valley over a dope ripoff—" The court interruped: "I think that goes beyond the question. Be a little more specific." The prosecutor asked: "What were you referring to?" and the witness answered: "Just that Scott had gotten away with something like this before." The prosecutor responded, "I don't think you understand the question, Mr. Corona." The court admonished the jury to disregard the testimony as unresponsive and irrelevant. At a sidebar conference, Brown's counsel argued that Corona's answer to the question was so unresponsive to the question that it reflected on his credibility and

ability to recall. The court refused to allow Brown's counsel to pursue the issue in his examination of Corona. The suggestion that it was misconduct to ask the question is meritless; it is obvious the prosecutor did not anticipate the answer given and was frustrated with her witness's obtuseness. In any event, Corona's statement itself was admitted into evidence without objection, and it contained references to some of defendant's other activities. That evidence being properly before the jury, this line of questioning cannot have harmed defendant, even if we were to assume, which we do not, that the jury failed to follow the court's admonition.

Defendant also refers to the examination of Charles Kempf regarding why he had backed out of an earlier plan to rob Kumar. Kempf explained that "the vibes were not good" and further that defendant had said, brandishing a knife, that he would get the drugs out of Kumar one way or another. Defendant does not explain in what way these questions were objectionable. When the prosecutor asked whether the witness thought defendant would use the knife, a defense objection was sustained. Defendant does not complain of or even mention the witness's next statement that he became afraid of defendant when defendant said that in an earlier robbery, he had stabbed the victim in the rectum. In this context, we see no prosecutorial misconduct.

d. *Argument to Jury*

In her opening statement at the guilt phase, the prosecutor read the letter she had written to propose a plea bargain for Art Corona in exchange for his testimony. The letter stated the prosecutor's belief that "Mr. Corona will testify completely and truthfully at any and all trials in this matter." Defendant argues the prosecutor thus improperly personally vouched for the credibility of her star witness. (See e.g., *People* v. *Sully, supra*, 53 Cal.3d at p. 1235; *People* v. *Gates* (1983) 43 Cal.3d 1168, 1187 [240 Cal.Rptr. 666, 743 P.2d 301].)

As he admitted *on the record* three days later, defendant did not object to this statement at the time it was made and did not request an admonition. Though he eventually objected to the evidence itself during the direct examination of Art Corona, his failure to object to the prosecutor's statement in a timely manner on the grounds sought to be raised on appeal bars the claim. This is not a situation in which an admonition could not have cured the harm. In any case, we do not think the jury would understand the remark as suggesting they should rely on the prosecutor's evaluation. (See *People* v. *Benson, supra*, 52 Cal.3d at p. 793 [reviewing court must determine how reasonable juror would understand remarks].) As counsel said later in objecting to the evidence of the letter itself, the comment in the opening

statement "went by so fast" that even he missed it at that time. In any event, any misconduct was not prejudicial; the court and the prosecutor told the jury that the arguments of counsel are not evidence, and the matter of Corona's credibility was fully explored without any suggestion the jury should rely on the prosecutor's evaluation of his credibility.

 In closing argument at the guilt phase, defendant claims the prosecutor committed misconduct in referring to defense witness Maxwell as a "weasel," in suggesting Norelli was a perjurer, in saying that defendant's witness Granara had referred to a police report that had not been produced and that he was not "following the script," in saying that defendant got caught in some lies, some "doozies," and in saying that his witnesses were "not strangers to the police department." These claims are meritless. The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence, to comment on failure to produce logical evidence, to argue on the basis of inference from the evidence that a defense is fabricated, and to comment on the evidence of prior convictions attributable to defense witnesses. (See, e.g., *People* v. *Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]. *People* v. *Adcox, supra,* 47 Cal.3d at 237; *People* v. *Terry* (1962) 57 Cal.2d 538, 561-562 [21 Cal.Rptr. 185, 370 P.2d 985].)

 Defendant claims the prosecutor referred in argument to matter outside the record, a practice that clearly is misconduct. (*People* v. *Benson, supra,* 52 Cal.3d at pp. 794-795.) Her suggestion, that because jurors saw Darell Dorn and Terry Pinholster in the hallway together during trial they should assume that Pinholster told Dorn to correct a misstatement in his testimony, was improper. But the inference that the alibi defense was fabricated arose naturally from the inconsistencies between the witnesses' earlier statements and their trial testimony, and from their relationships with the defendants, so we see no possibility of prejudice.

 The prosecutor argued the alibi was incredible because none of the witnesses who gave evidence in support of it had attempted to exonerate defendant with the police or prosecutor before the trial, despite their familiarity with the police department and the prosecution. Defendant claims the reference to the familiarity of the witnesses with the police department was a reference to matter outside the record, namely, that the witnesses all had criminal records. Defendant failed to object, and in any event we do not think the comment would be understood this way. The trial testimony showed that seven of the ten alibi witnesses had been in contact with the police before trial but failed to mention the alibi. The argument, that the trial testimony of a witness other than the defendant is less credible for being

offered for the first time at trial, is a permissible comment on the state of the evidence. (See, e.g., *People* v. *Szeto, supra,* 29 Cal.3d at p. 34.) At worst, the argument used the underworld milieu of the witnesses to argue, somewhat unpersuasively in our opinion, that the witnesses' familiarity with the police department would lead them to present themselves to the police at the first possible moment to exonerate their arrested friend.

■ With respect to defendant's complaint about the prosecutor's argument accusing *Brown's* attorney of bad faith in claiming the prosecutor had coached Corona to say that Brown had plunged his knife into his victim "up to the hilt," we see no possibility that this comment could have affected the jury with respect to *defendant's* case.

■ Defense counsel argued that if defendant had gotten to the police station first, he would have gotten the deal and Corona would have been prosecuted. The prosecutor rebutted this claim with the statement that this was "wishful thinking" and that the jury had heard why it was that Corona had gotten the deal. We see no impropriety in this rebuttal, based as it was on the record. Nor do we see impropriety in her rebuttal of the defendant's claim that there was a secret prosecutorial deal with Corona. The prosecutor was entitled to argue that if the defense thought there was such a deal, they could have called her, a logical witness, to the stand to examine her about it. (See *People* v. *Bell, supra,* 49 Cal.3d at p. 539 [proper to comment on failure to call logical witness].)

■ Defendant also complains of the following: Codefendant Brown's counsel, in closing argument, attacked Corona's credibility and emphasized the accomplice-corroboration rule. He told the jury if it ignored the instructions "you are really no better than Scott Pinholster, you have no more regard for the law or rights of anybody else or for our system than Scott Pinholster." Defendant did not object. The prosecutor repeated Brown's argument, and said, "To even mention your names in the same breath I find utterly an insult." There was no objection or request for admonition. In any case, we do not view the argument as an appeal to passion and prejudice, but as within the range of forceful language warranted by the evidence. (See, e.g., *People* v. *Thornton* (1974) 11 Cal.3d 738, 762-763 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Terry, supra,* 57 Cal.2d at pp. 561-562.)

■ Near the end of her rebuttal, the prosecutor argued that only in America are defendants accorded trials even in the face of overwhelming evidence. She said: "I've had rape trials where a man's been caught on top of a woman raping her and we are still in a trial. [¶] And you've all heard about trials where someone confessed, but that confession was beaten out of them.

[¶] They are entitled to their trial and they have had it. It's time to put an end to this farce, ladies and gentlemen. It really, really is." Brown's counsel objected, and the objection was overruled. The sidebar conference was not reported, but at the conclusion of argument counsel repeated his objection and moved for a mistrial, and defendant's counsel joined. Brown's counsel argued that the prosecutor had made an improper appeal to passion and prejudice, had relied on matters outside the record in discussing other trials, and had suggested that the defendants did not deserve to have a trial.

Any suggestion that when there is overwhelming evidence of guilt, it is a farce to provide a trial is obviously improper. It may be that the jury understood the comment, as respondent claims, only as referring to the alibi and diminished capacity defenses as farcical in light of the overwhelming evidence of guilt. In any event, it is inconceivable that the improper comment was prejudicial. It must have been clear to the jury that the court, the prosecutor and all defense counsel litigated the matter very carefully, that in no sense was the proceeding a farce or sham, that the jurors were expected to take their responsibilities carefully, and that all parties anticipated that the jurors would apply the law to the facts in arriving at their verdict. In addition, the jurors were specifically instructed that the statements of counsel were not evidence, and that they were not to be swayed by passion or prejudice. They were instructed that all parties had "a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be." We find no prejudicial misconduct.

### e. Defendant's Marriage

 Defendant claims misconduct in the prosecutor's efforts to prevent his marriage to Cathy Smith. While the prosecutor did seek to delay the marriage until after trial in order to prevent the assertion of the marital privilege, she frankly admitted she had no authority to do so and her efforts were unsuccessful. Several months before trial the two were married. Smith testified against defendant nonetheless. We see no theory upon which defendant can argue prejudicial misconduct.

### f. Cumulative Prejudice

 We have identified no misconduct which, taken singly or together, convinces us that defendant was prejudiced, or, as defendant claims, subjected to an unfair trial in violation of his state and federal constitutional rights to due process and a reliable determination of penalty. (See *People* v. *Bell, supra,* 49 Cal.3d at pp. 533-534; *People* v. *Harris* (1989) 47 Cal.3d 1047, 1083-1084 [255 Cal.Rptr. 352, 767 P.2d 619].)

### 6. *Instructional Error*

#### a. *Sound Mind Instruction*

Defendant claims that an instruction that the jury should assume that he was "of sound mind at the time of his alleged conduct" (former CALJIC No. 3.34) amounted to a conclusive presumption that lightened the prosecutor's burden of proof on the element of specific intent applicable, he claims, to "most" of the charges against him, in violation of the due process clauses of the state and federal Constitutions.[12] He claims that the instruction interfered with the jury's consideration of his claim that because of drug and alcohol intoxication, he did not form the necessary specific intent. He argues that the instruction may have caused the jury to shift the burden of proof to him, and that it may have caused the jury to fail to consider the evidence at all, even in deciding whether there was any reasonable doubt on the element of intent.

Given the full spectrum of instruction on the issues of intent and voluntary intoxication, we find, as we have before, that it is not reasonably likely the jury would "have discerned in the presumption of mental soundness a presumption of sobriety." (*People* v. *Mickey* (1991) 54 Cal.3d 612, 671 [286 Cal.Rptr. 801, 818 P.2d 84]; see also *People* v. *Kelly* (1992) 1 Cal.4th 495, 525-526 [3 Cal.Rptr.2d 677, 822 P.2d 385].) A "sound mind" does not convey to us, or to the reasonable juror, we think, the concept of sobriety. Rather, it conveys the absence of mental illness (see *People* v. *Gorshen* (1959) 51 Cal.2d 716, 729 [336 P.2d 492]; former § 21, as enacted in 1872; see also *People* v. *Mickey*, *supra*, 54 Cal.3d at p. 670.) Reading the instructions as a whole, as we must (*Francis* v. *Franklin* (1985) 471 U.S. 307, 315 [85 L.Ed.2d 344, 354, 105 S.Ct. 1965]; *Cupp* v. *Naughten* (1973) 414 U.S. 141, 147 [38 L.Ed.2d 368, 373-374, 94 S.Ct. 396]), we think it is reasonably likely the jury would understand that the People had the burden of proving defendant's specific intent, and that while defendant's sanity for the purpose of proving specific intent was generally presumed, evidence of intoxication and abnormal physical condition was nonetheless relevant to raise a reasonable doubt whether specific intent had been proven.

#### b. *CALJIC No. 17.10*

Defendant claims the court erred in instructing the jury pursuant to CALJIC No. 17.10 (1982 rev.), because, he claims, the instruction told the jury that it could not consider the possibility that defendant committed only

---

[12]The portion of CALJIC No. 3.34 that appellant complains of was withdrawn from the standard instruction in 1981.

a lesser included offense until it unanimously decided that he was not guilty of the greater offense of murder in the first degree. Respondent claims invited error, since defendant requested the instruction, but there is little indication of a deliberate tactical purpose to focus the jury on reaching a verdict on the first degree charges before they considered the lesser offenses. (Compare *People* v. *Hernandez, supra,* 47 Cal.3d at p. 353.)

■ Of course, a jury may consider the lesser offenses before returning a verdict on the greater offense, though it may not return a verdict on the lesser offense until it has agreed that defendant is not guilty of the greater offense. (*People* v. *Kurtzman* (1988) 46 Cal.3d 322, 329 [250 Cal.Rptr. 244, 758 P.2d 572].) Nonetheless, we have rejected defendant's argument in the context of CALJIC No. 8.75, finding that the jury would not be misled by the instruction. (*People* v. *Nicolaus* (1991) 54 Cal.3d 551, 580 [286 Cal.Rptr. 628, 817 P.2d 893]; *People* v. *Hunter* (1989) 49 Cal.3d 957, 975-976 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Adcox, supra,* 47 Cal.3d at pp. 241-242; *People* v. *Hernandez, supra,* 47 Cal.3d at pp. 352-353.) ■ CALJIC No. 17.10, even in its 1982 form,[13] is even less likely to mislead, since it does not refer the jury to a series of deliberative decisions and verdict forms. (See *People* v. *Kurtzman, supra,* 46 Cal.3d at pp. 330-331, see also *People* v. *Adcox, supra,* 47 Cal.3d at p. 242.) We find nothing in the instruction or the record of the jury's deliberations to suggest the jury believed it must return a verdict on the greater offense before it could even discuss the lesser offenses. Accordingly we reject the claim that the giving of the instruction violated the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

### c. *Comment on Complexity of Jury Instructions*

■ Both the trial court and the prosecutor commented to the jury on the length and complexity of the jury instructions. Defendant complains these comments produced basic misapprehensions about the importance of the jury instructions, in violation of his state and federal constitutional rights to due process, fundamental fairness, an unbiased jury, and a reliable determination of penalty.

Defendant's brief quotation takes the court's comment out of context and distorts it. The court said as it began to instruct the jury in the guilt phase of trial: "This is the time in the trial of the guilt phase of this matter for the court to read you the instructions. I am required by law to read these to you. It is not one of the real interesting and exciting ways to spend a morning, but

---

[13]Later editorial revisions do not, contrary to defendant's claim, force us to conclude that the 1982 version of the instruction was prejudicially misleading.

it is of utmost importance. [¶] As I say, it is also required by law. [¶] You will find these instructions somewhat complex. Let me tell you in advance that I am going to give these instructions to you prior to your going into the jury room to deliberate. So when you do go into the jury room to deliberate, you will have the exact copy from which I have read. So you might want to consider the possibility of not taking notes during these readings because you will have the exact instructions in there. [¶] If it helps you to remember and focus on what we are doing here to take notes, obviously you are free to do that. [¶] *In my 16 years of dealing with criminal law in one part of it or another, I have never encountered a situation where it was necessary to give this many instructions. The most instructions that I have ever given . . . is probably half this many.* We have 110 pages of instructions. [¶] It is the process of working these instructions out that has occupied counsel and I during this relatively lengthy break between the taking of testimony and today. [¶] It is necessary under the law to give you these instructions. They address themselves and try to explain to you and define for you some pretty esoteric legal concepts. [¶] I will try to read them in a manner that will allow you to get some of the flavor and some of the feeling of what we are doing. [¶] I think the best thing to do, as I say, is just to try to listen and try to feel the flow of it and follow it in your mind and understand that you will have them present before you, and you will be able to study them at whatever length is necessary for your deliberations."

There is absolutely no merit to defendant's complaint that the italicized language "inevitably suggested that defendant's criminality here was twice as bad as any [the judge] had seen," or suggested that the jury was not expected to bother to understand or follow the instructions, in violation of his rights to due process, fundamental fairness and an unbiased jury. It is patently clear the court was soliciting the jury's patience and assiduity in trying to understand the volume of instructions.

Defendant also claims the prosecutor added to the court's "error" by telling the jurors not to be concerned if they did not understand all the instructions. She said: "You have all sat here today and listened to a bunch of instructions, I think the court at various points called esoteric or difficult. [¶] I sat there listening and I had [them] in front of me, and even having heard them before they are confusing. They are. Not only to lay people, but people within the criminal justice system as well. Don't feel concerned if you don't understand any of them or only a few of them." Any suggestion that the jurors could proceed to judgment without *ever* understanding the instructions would be a gross misstatement of law, but, of course, the jurors were instructed to follow the law as stated by the judge, who had emphasized so carefully the importance of the instructions. The prosecutor herself, far from

suggesting to the jury that the instructions could be ignored, spent a large proportion of her time in closing argument meticulously explaining the instructions and applying them one after the other to the evidence produced at trial. We see no error or possibility of harm to defendant.

### D. *Special Circumstance Issues*

#### 1. *Intent to Kill*

 Defendant argues that the court gave confusing and ambiguous instructions on the issue of intent to kill. Defendant urges that because the evidence showed he might have been only an aider and abettor with respect to the murder of Johnson, the felony-murder special-circumstance allegations as to that killing can stand only if the jury found he had intent to kill. (*People* v. *Anderson, supra,* 43 Cal.3d at p. 1147.)[14] His complaint is not that the court failed to instruct on the point, but that the instructions given were confusing and ambiguous, in violation of his state and federal due process rights to fundamental fairness and a reliable determination of penalty.

The court instructed on the special circumstance allegations generally that: "If defendant Pinholster was not the actual killer, it must be proved beyond a reasonable doubt that he *intentionally aided,* abetted, counseled, commanded, induced, solicited, requested or assisted *the actual killer* in the murder of the first degree before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant Pinholster." [Italics added.]

Defendant complains that the italicized language would permit the jury to find the special circumstance allegations true without finding intent to kill, but finding, rather, only an intent to aid the actual killer in a nonhomicidal act. We have rejected defendant's reading of such instructions, finding that the reasonable juror would not interpret them as defendant suggests. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 516-517 [273 Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Warren, supra,* 45 Cal.3d at pp. 487-488; see also *People* v. *Beardslee* (1991) 53 Cal.3d 68, 91 [279 Cal.Rptr. 276, 806 P.2d 1311]; *People* v. *Gallego* (1990) 52 Cal.3d 115, 182 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Carrera, supra,* 49 Cal.3d at pp. 310-311.)[15]

Defendant complains that additional misinstruction increased the risk that the jury would misunderstand its task in assessing his intent to kill. He

---

[14]Defendant makes the same claim with respect to the murder of Robert Beckett in a footnote, conceding, though, that the evidence was stronger that he was the actual killer of Beckett. We reject the claim because we find no error in the instructions.

[15]In *People* v. *Warren, supra,* 45 Cal.3d at page 486, the instruction stated that " 'defendant was . . . either the actual killer or a person who intentionally aided, abetted, counseled, commanded, induced, solicited, requested or assisted the actual killer in the commission of

points out that with respect to the multiple-murder special circumstance, the court instructed orally: "To find the special circumstances referred to in these instructions a multiple murder convictions to be true [*sic*], it must be proved . . . that the defendant intended to kill or *aid and abet the killer* of at least one of the victims." [Italics added.] We reject the claim. The court supplied the jury with the instructions in writing and noted their usefulness for deliberations. The written instruction on the multiple-murder special circumstance correctly used the word "killing" rather than "killer." The court clearly defined the necessary intent in instructing on the felony-murder special circumstances, stating as to each that the jury must find "that the defendant intended to kill or to aid in the *killing* . . . ." [Italics added.] Viewing the instructions as a whole, we think no reasonable juror would conclude that a special circumstance allegation could be found true without proof that defendant, as an aider and abettor, had intent to kill. We find no error.

### 2. *Multiple-murder Special Circumstances*

As respondent concedes, it was error to charge and to allow the jury to find two multiple-murder special circumstances in this case. (*People v. Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115].) One of the findings must be set aside. We reject defendant's argument that the error violated his right to a fair and reliable penalty determination by an unbiased jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel state constitutional provisions. "We have consistently found that an error of this nature is harmless." (*People v. Jones, supra,* 53 Cal.3d at p. 1149; see also *People v. Gallego, supra,* 52 Cal.3d at p. 201.) The prosecutor did not attempt to inflate the number of special circumstances in closing argument, or use the redundant special circumstance in arguing the predominance of aggravating over mitigating circumstances. We see no reasonable possibility of prejudice.

### E. *Penalty Phase Issues*

#### 1. *Notice of Aggravating Evidence*

Defendant contends he received inadequate notice of the evidence the prosecutor intended to present in aggravation at the penalty trial, in violation of section 190.3 and in violation of his rights to due process and a fair and reliable determination of sentence under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

---

murder in the first degree.' " The instruction in *People v. Sanders, supra,* 51 Cal.3d at page 516, was essentially the same. Despite defendant's claim, we fail to see how the addition of the term "commission of," found in the instruction in *Warren* and *Sanders* but not in the one read to the jury in this case, would make any difference to the jury's understanding of the charge.

The prosecutor stated that she sent a letter to defendant while he was in propria persona, giving him notice of the evidence to be presented in aggravation. Defendant contended at trial that he never received the letter; after an evidentiary hearing, the court found against him. Defendant renews his claim that he never received the letter, and argues for the first time that the letter was couched in general terms and was not specific enough to provide adequate notice, and that in any event the prosecutor called four witnesses whose testimony was in no way prefigured by the letter.[16]

Having reviewed the record, we accept the trial court's factual determination that defendant received the letter as supported by substantial evidence. Counsel never objected that any evidence introduced at the penalty trial was received in violation of defendant's right to notice under section 190.3, either on the ground that the notice was vague or that certain witnesses were not mentioned. Defendant's failure to object to the admission of evidence not mentioned in the letter means that any claim beyond the assertion that the prosecutor had not delivered the letter to defendant is not cognizable on appeal. (*People* v. *Carrera, supra,* 49 Cal.3d at p. 334; see also *People* v. *Turner* (1990) 50 Cal.3d 668, 708 [268 Cal.Rptr. 706, 789 P.2d 887].)

Assuming that we should reach defendant's claims on the merits, we observe that " '[i]n the absence of any indication that the delay in the notice . . . affected [counsel's handling of] prior proceedings, . . . .' " the remedy for failure to provide adequate notice of evidence in aggravation is a continuance " 'as needed to allow defendant to develop a response.' " (*People* v. *Cooper, supra,* 53 Cal.3d at p. 842, quoting *People* v. *Carrera, supra,* 49 Cal.3d at p. 334.)

Defendant asks us to presume that counsel requested a continuance because of the court's failure to order all sidebar conferences reported. Our review of the record persuades us that we have an ample record upon which to determine whether there was a motion for continuance.

Counsel's objection to the notice in the first instance can only be characterized as halfhearted. His only claim was that he had no record that the People had served the requisite notice. He conceded that his predecessors as counsel might have received it. Once the prosecutor showed counsel a copy of the letter she had sent, counsel conceded that the normal rules of procedure would raise a presumption that defendant had received the notice, and counsel left the matter up to the court to handle. The court was solicitous and invited counsel to consider whether a continuance might be necessary.

---

[16]The four witnesses were Officers Taube, Kaufman and Guzman, and civilian witness Theodore Mesquita.

Because of the claimed deficiency of the record, we quote the record in detail.

The court directed that they go off the record,[17] then returning to the record, observed that it had asked the jury to return on the following Monday. "The court has yet to resolve the issue as to whether or not sufficient notice was given to the defendant concerning additional evidence the prosecution is to present at that penalty phase. As I indicated off the record a moment ago, it strikes me if the court rules notice was not given, then we will proceed without the People having the opportunity to present additional evidence. [¶] If the defense presents no evidence on the issue of mitigation, then presumably both sides would argue based on what the jury heard during the course of the trial. [¶] *My question then would be to defense counsel, if the court should rule that there was sufficient notice given, and we are still inquiring into that, what would the defense position be with regard to proceeding.*" (Italics added.)

Defense counsel responded: "*I think we would probably still go forward on Monday. [¶] Clearly the one person that comes to mind is the defendant's mother. How much beyond that I don't know. [¶] I don't think the passage of time would make a great deal of difference.*" (Italics added.) The court then made the following invitation: "We would continue to leave the Monday date, and *if between now [Tuesday] and Monday something material occurs to you that causes you to believe that is not satisfactory, obviously you will have leave to reopen that issue before the court and we can consider it.*" (Italics added.) While counsel reserved defendant's claim that he had not received the letter pending a hearing to determine that fact, counsel conceded that he would be able to proceed to the penalty trial if the court ruled against him. It is evident that defense counsel felt no need for a continuance.

When the matter was called on April 30, defense counsel did not make any objection to proceeding. Counsel did not move for continuance, or suggest that there had been inadequate time to prepare. Counsel did not object to any witness called by the prosecutor. In fact, counsel stipulated to defendant's various disciplinary infractions in state prison.

 In the absence of evidence that the untimely notice affected earlier proceedings, the failure to request a continuance normally shows that any defect in the notice is not prejudicial. (*People* v. *Carrera, supra,* 49 Cal.3d at

---

[17]This is the only unreported sidebar conference connected with the notice question. The settled statement shows that: "The subject of this conference was how to establish whether or not a 190.3 letter had been received and defense counsel's preparedness to proceed if the court ruled the district attorney could present such evidence. Beyond this, counsel are unable to add to what the existing record reflects."

p. 334, see also *People* v. *Cooper*, *supra*, 53 Cal.3d at p. 842.) ▮▮▮▮ Defendant can point to no way in which his defense was "actually hampered" by the manner in which notice was given. (*People* v. *Turner*, *supra*, 50 Cal.3d at p. 709.) There being absolutely no indication in this very complete record that defendant needed more time to develop a response, we see no reasonable possibility of prejudice. (See *People* v. *Taylor* (1990) 52 Cal.3d 719, 737 [276 Cal.Rptr. 391, 801 P.2d 1142].)

Defendant argues that failure to move for continuance is not determinative in this context; it is only when the prosecutor's failure to give notice is excused by late discovery of the evidence, or when the notice is defective as to relatively minor penalty evidence, that defective notice can be excused. ▮▮▮▮ This is not the case; the question is whether there is any reasonable possibility that defendant was prejudiced. (*People* v. *Taylor*, *supra*, 52 Cal.3d at p. 737.) The purpose of the notice provision is to assure the accused of a reasonable opportunity to prepare a defense at the penalty trial. (*People* v. *Walker*, *supra*, 47 Cal.3d at p. 637; *People* v. *Howard* (1988) 44 Cal.3d 375, 425 [243 Cal.Rptr. 842, 749 P.2d 279].) When there is no claim that late notice has either impaired preparation for the guilt trial or will impair the preparation of the defense at the penalty trial, and there has been no request for continuance, there can normally be no prejudice flowing from the late notice. ▮▮▮▮ Here, the prosecutor did deliver notice which, although general, gave an indication of the evidence to be introduced. In addition, defense counsel did not dispute the prosecutor's claim that she had given them actual notice of at least some of the evidence to be presented, and had opened her file to them. Finally, the court urged defense counsel to consider whether more time would be needed to prepare for the penalty trial. (Compare *People* v. *Jennings* (1988) 46 Cal.3d 963, 987 [251 Cal.Rptr. 278, 760 P.2d 475].) ▮▮▮▮▮▮▮ Under the circumstances, we see no reasonable possibility of prejudice.[18]

## 2. *Evidentiary Issues*

### a. *Testimony of Victims' Mothers*

▮▮▮▮ Defendant contends his right to due process was violated when the trial court, during the guilt phase, refused to accept his stipulation to the

---

[18]Defendant argues in a footnote that the court erred in making the implicit finding that the prosecutor could meet the notice requirement of section 190.3 by serving notice on defendant in propria persona without serving the notice again on counsel once they were appointed. This argument was not raised below. In any case, we disagree: "[a] defendant appearing in propria persona is held to the same standard of knowledge of law and procedure as is an attorney." (*People* v. *Clark*, *supra*, 50 Cal.3d at p. 625.) Further, it is defense counsel's obligation to secure from the defendant who represented himself all materials served on him during the period of self-representation.

identity of the victims as shown in proferred photographs in lieu of the identification testimony of the victims' mothers. He claims the evidentiary error was prejudicial because Mrs. Beckett wept when she saw her son's photograph. Respondent counters that the offer to stipulate was not explicit enough to fall under our holding in *People v. Bonin* (1989) 47 Cal.3d 808, 848-849 [254 Cal.Rptr. 298, 765 P.2d 460]. In any event, any error could not have been prejudicial at the guilt phase, given the state of the evidence against defendant, and because the prosecutor did not mention the episode in her closing argument.

Defendant's primary contention seems to be that the error was prejudicial at the penalty phase under *Booth v. Maryland* (1987) 482 U.S. 496, 503-506 [96 L.Ed.2d 440, 448-450, 107 S.Ct. 2529], and *South Carolina v. Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207]. Of course, this authority has since been reconsidered. (*Payne v. Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597].) A majority of this court has determined that " 'evidence of the specific harm caused by the defendant,' " including evidence of impact on the family of the victim, is admissible under factor (a) of section 190.3. (*People v. Edwards, supra*, 54 Cal.3d at p. 833, quoting *Payne v. Tennessee, supra*, 501 U.S. at p. __ [115 L.Ed.2d at p. 735, 111 S.Ct. at p. 2608].) Here, neither the evidence itself nor the prosecutor's argument suggested that " 'emotion may reign over reason' " or that irrational, purely subjective responses should carry the day. (*People v. Edwards, supra*, 54 Cal.3d at p. 836.) The witness's emotion was quickly controlled, and the prosecutor did not refer to it in argument. Thus, assuming for the purpose of discussion that there was an abuse of discretion at the guilt trial, we see no possibility of prejudice at the penalty trial.

### b. *Juvenile Misconduct*

Defendant contends that evidence of his juvenile misconduct was inadmissible at the penalty trial, as it did not fall within the definition of prior criminal activity expressed in section 190.3, factor (b). He apparently refers to evidence of his courtroom assault on a bailiff during a juvenile proceeding. We have held, however, that violent criminal activity of a juvenile is admissible under section 190.3, factor (b). (*People v. Burton* (1989) 48 Cal.3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270].) In any case, defendant's failure to object to the admission of the evidence bars our consideration of the issue on appeal. It also bars our consideration of his further, conclusory argument that admission of the evidence was a violation of his Fifth, Eighth and Fourteenth Amendment rights to a penalty phase determination based upon suitably limited criteria, citing *Furman v. Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726], and that reliance on

such evidence is a violation of the state and federal prohibitions against cruel and unusual punishment, citing *Thompson* v. *Oklahoma* (1988) 487 U.S. 815 [101 L.Ed.2d 702, 108 S.Ct. 2687]. The general rule that any claim regarding the admissibility of evidence will not be reviewed on appeal unless there was a specific objection on the ground raised is applicable in capital cases. (*People* v. *Poggi, supra,* 45 Cal.3d at p. 331; see also *People* v. *Gordon, supra,* 50 Cal.3d at p. 1240, fn. 2; *People* v. *Mattson* (1990) 50 Cal.3d 826, 853-854 [268 Cal.Rptr. 802, 789 P.2d 983].) In any event, defendant's reliance on *Thompson* v. *Oklahoma, supra,* 487 U.S. 815, is misplaced. (*People* v. *Cox, supra,* 53 Cal.3d at p. 689.)

c. *Boyd Error*

 In *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782], we held that section 190.3 "expressly excludes evidence of criminal activity, except for felony convictions, which activity 'did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence.' " (Fn. omitted.) Defendant contends that much of the evidence offered against him at the penalty trial transgressed this rule.

The claim is barred by defendant's failure to object below. (*People* v. *Clark, supra,* 50 Cal.3d at p. 624.) We have held that it is not an unreasonable burden to require parties to object on the ground raised here even in advance of our decision in *Boyd, supra,* 38 Cal.3d at page 776. (*People* v. *Clark, supra,* 50 Cal.3d at p. 624.) While it was necessary for us to explain in *Boyd* that the statutory language does not permit evidence of violent injury to property, the express language of the statute made it clear that criminal activity not involving force or violence is inadmissible. As we explained: "In the face of an express statutory command governing the admissibility of evidence a party may not complain that failure to object is excused because he could not be held to anticipate a judicial decision holding that the statute means just what it says, but limits its application. ▪ ██ This is not a situation in which an unreasonable burden is placed on a party by expecting him to understand the meaning of a statute or in which because of prior controlling law an objection would have been futile and is therefore excused." (*People* v. *Clark, supra,* 50 Cal.3d at p. 625; compare *People* v. *Gordon, supra,* 50 Cal.3d at p. 1266 [failure to object to prosecutorial argument regarding sympathy for the victim excused, since case tried before

*People* v. *Boyd, supra*, 38 Cal.3d 762, and *South Carolina* v. *Gathers, supra*, 490 U.S. 805].)[19]

■ Even if we were to reach the merits of the claim, we see no prejudicial error. Defendant complains that the evidence of his outburst in juvenile court, of his conduct during two arrests, and much of his misconduct in jail awaiting trial was not admissible. But he admits that "on some theoretical level, some of these activities may arguably constitute assault or battery." As we read it, the record is rife with examples of actual assault and battery and violent interference with an officer in the course of his duties (§§ 69, 240, 242.) During the juvenile proceeding, defendant struck the bailiff. He kicked Officer Kaufman in the head during an arrest. Officer Guzman testified that while he was transporting defendant to the station, defendant tried to kick him in the head and succeeded in kicking Guzman's partner in the leg. Deputy Sheriff Loper testified that defendant kneed him in the groin as Loper tried to restrain him. Deputy Sheriff Piggott testified that defendant struck another inmate in the head and ribs, and struck another deputy. We agree with respondent that throwing a cup of urine in a person's face is a battery, since "[a]ny harmful or offensive touching constitutes an unlawful use of force or violence" and thus a battery under section 243. (*People* v. *Martinez* (1970) 3 Cal.App.3d 886, 889 [83 Cal.Rptr. 914].)

■ Of course the circumstances surrounding the violent offenses may be described without violating the statute; the conduct may be presented "in context, so that the jury has [a] full opportunity, in deciding the appropriate penalty, to determine its seriousness." (*People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741].) Further, "all crimes committed during a continuous course of criminal activity which includes the use of force or violence may be considered in aggravation even if some portions thereof, in isolation, may be nonviolent." (*People* v. *Cooper, supra*, 53 Cal.3d at p. 841.)

■ We are left with the following evidence that is arguably inadmissible under *Boyd, supra*, 38 Cal.3d 762: (1) Officer Taube's testimony that defendant was involved in gang activities and that Taube had difficulty supervising him; (2) Deputy Sheriff Piggott's testimony regarding defendant's disciplinary violations in county jail other than assaults, Piggott's testimony regarding defendant's placement in administrative segregation, Piggott's opinion that defendant was probably one of the two or three most

---

[19]In a footnote, defendant contends the court erred in refusing to instruct that evidence of conduct not amounting to violent crime is not admissible in aggravation. We have recently said that the standard instruction in the terms of the statute adequately conveys this idea. (*People* v. *Hayes* (1990) 52 Cal.3d 577, 639-640 [276 Cal.Rptr. 874, 802 P.2d 376]. This suggestion is consistent with our decision in *People* v. *Clark, supra*, 50 Cal.3d at page 624, that the statutory language itself clearly states this concept. We reject defendant's claim.

violent inmates at the facility, and Piggott's testimony that defendant did not reform as a result of disciplinary measures and that defendant told him that if he were not sent to state prison he would "go out on the streets and do something to get back in;" (3) Deputy Loper's testimony that defendant had a tendency to threaten people, and that defendant had threatened other, "mainly black" inmates; (4) Deputy Barrett's testimony that defendant said he was so "mad" he would have to kill Art Corona upon defendant's release from prison, and that defendant said he thought he would serve little prison time on the offenses charged in this case; and (5) the stipulation as to defendant's disciplinary history in state prison.

The prosecutor did make use of the challenged evidence in her penalty phase argument, most particularly arguing against the sentence of life without possibility of parole because of defendant's statement that he would kill Art Corona—she conveyed the impression that it would be possible for defendant to carry out this threat while in prison. In addition, referring to his juvenile, jail, and prison records, she argued that he could not be rehabilitated. She said: "He will continue his marauding in the state prison system. He will continue assaulting, he will continue the exact same type of behavior he's engaged in recently and all his life." She properly argued the evidence of his prior crimes of violence, but also drew from the evidence the argument that defendant "doesn't like authority," that his behavior did not improve when he was in prison, and that his spitting and kicking show "he's a lovely person." She argued the evidence of defendant's behavior in county jail pending trial: "While he's been in jail for the past 27 months awaiting trial for a double murder, did he try to get his act together: Did he undergo classes, try to do anything to rehabilitate himself? No. He's known for kicking, spitting, assaulting, threatening other inmates and deputies and of throwing urine on deputies . . . . What kind of person are we dealing with here? According to Sergeant Piggott, we are dealing with what he terms is one of the two or three most violent inmates in county jail, a jail that on any given day has 6,000 people going through. That's what we are dealing with here."

In *People* v. *Wright, supra,* 52 Cal.3d at page 426, we commented that we had never reversed a penalty verdict for *Boyd* error alone. We pointed out that we have found nonprejudicial the erroneous admission of nonviolent juvenile adjudications, threats to kill a police officer, a threat to a prison guard, instigation of a food riot, threats of sexual and other violence, evidence of failure to reform, numerous other threats of violence, and manipulative behavior on parole. (*Ibid.,* and cases cited.) Here, the properly admitted evidence of assaults on court staff, police officers, deputy sheriffs, and other inmates clearly conveyed the impression defendant complains of

that he was an intractable person who was not a good candidate for rehabilitation. We are not particularly disturbed by the inadmissible evidence relating to his conduct in jail, since admissible evidence of his assaults and batteries gave a clear enough picture of this. Defendant's own testimony depicted him as an unregenerate career criminal. Thus we find clearly nonprejudicial the opinion testimony that defendant was not subject to rehabilitation and that he was one of the most violent prisoners in the county jail. The evidence of defendant's threat to kill Art Corona could have been no surprise to the jury after the guilt phase evidence to that effect, and the jury was entitled to consider the threat to Corona as a circumstance of the charged crimes. Finally, the evidence of the charged offenses showed a violent nature. (See *id.* at p. 429.)

In light of the circumstances of the charged crimes and the volume of evidence of prior criminal activity that was properly admitted, there can be no reasonable possibility that any improperly admitted evidence was prejudicial.[20]

### 3. *Prosecutorial Misconduct*

Defendant claims the prosecutor committed misconduct in making the following argument to the jury: "If you spare [defendant's] life will it be at the expense of someone else's? If he has life without the possibility of parole, what's he going to do to the other deputies and inmates in whatever prison he goes to?" A little while later she said: "I say to you if there is one redeeming factor in this defendant's past or present life, or if you can even envision a redeeming factor occurring in the future, then spare his life. I don't believe Scott Pinholster could be rehabilitated or lead any kind of a useful life. [¶] His past and present, I think, have amply demonstrated that. [¶] He will continue his marauding in the state prison system. He will continue assaulting, he will continue the exact same type of behavior he's engaged in recently and all his life."

There was no objection or request for admonition, and this bars our consideration of the issue. (*People* v. *Bell, supra,* 49 Cal.3d at pp. 547-548.) Even if we were to reach the merits, defendant's claim fails. Defendant objects to the reference to his future dangerousness; we have approved such argument. (*People* v. *Bell, supra,* 49 Cal.3d at pp. 548-550; *People* v. *Adcox, supra,* 47 Cal.3d at pp. 258-259.) Nor do we consider the argument inflammatory, as defendant claims, or as a comment on the prosecutor's personal

---

[20]We reject defendant's conclusory claim that the admission of this evidence violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (See, e.g., *People* v. *Benson, supra,* 52 Cal.3d at p. 789; *People* v. *Balderas, supra,* 41 Cal.3d at pp. 204-205.)

belief in defendant's guilt. Rather, the prosecutor clearly was arguing on the basis of the evidence that defendant deserved the death penalty under the statutory scheme.

■ Defendant also claims the following argument was misconduct: "What mitigating circumstances were presented? Nothing except a mother who loves her son. Even the most heinous person born, even Adolph [*sic*] Hitler, probably had a mother who loved him." There was no objection and request for admonition. (See *People* v. *Poggi, supra,* 45 Cal.3d at p. 335.) Even if we were to reach the merits, we do not see this comment as an attempt to revive the issue of Nazism and gang membership at the penalty trial. Rather, we think the reasonable juror would understand the comment as attempting to diminish the weight of defendant's evidence in mitigation, that is, the evidence of his mother's attachment to him. (See *People* v. *Adcox, supra,* 47 Cal.3d at p. 259.)

■ Defendant claims the prosecutor purposely elicited inadmissible statements from two of her witnesses at the penalty trial. While it is misconduct for a prosecutor to " 'intentionally elicit inadmissible testimony' " (*People* v. *Bonin, supra,* 46 Cal.3d at p. 689), we see little evidence of such conduct here. In response to the suggestion on cross-examination of juvenile probation officer Taube that he had not made enough effort to rehabilitate defendant, the prosecutor asked how often Taube had met with defendant. The witness had met with defendant weekly. The prosecutor asked "Did you at any point in time during these meetings or prior to these meetings form an opinion as to whether he would be amenable to your supervision." The question called for a "yes" or "no" answer. The witness answered: "Well, it's—I knew one thing that I did have a lot of difficulty supervising him, because his activities were *into gang type activities,* and you know that you are going to have some problems in this area, and so you kind of keep an eye out on that person." The narrative answer and the italicized language went beyond the prosecutor's question.

The second example given is of the examination of Deputy Sheriff Loper, who described defendant's attack on him and other deputies at the county jail. The deputy said he had numerous "run-ins" with defendant. After he described one such incident, this exchange followed: "Any other episodes that you recall involving acts of violence, sir? A: He used to have a tendency to threaten people. Q: Were you ever witness to those threats? A: No. I've talked to him before, and he's told me he has threatened other inmates, *mostly black,* but I've talked to him before and he's already been pretty open when he's talking to a lot of the deputies about his own feelings." [Italics added.]

Defendant failed to object or ask for an admonition in either instance. We agree with respondent that there is no indication the prosecutor purposely

elicited the emphasized responses; rather, she was pursuing legitimate lines of inquiry.

 Defendant complains that the prosecutor committed misconduct in not serving the notice of evidence in aggravation required by section 190.3 on the defense attorneys before trial. But, as we have seen, the district attorney did send the required notice to defendant, who was then acting as his own counsel. Defendant had the obligation to turn over to his counsel any matter relevant to their representation of him. Counsel did not argue at the trial that the prosecutor had a duty to re-serve them when they were appointed some four months after she sent the letter to defendant. Defendant has provided no authority to that effect and, in any case, as we have found, counsel's failure to request a continuance or object to the testimony of any witness demonstrates that the late notice was not prejudicial.[21]

### 4. *Instructional Error*

#### a. *Reasonable Doubt Instruction*

 ██ ██ The trial court erred, as respondent concedes, in failing to instruct that allegations of unadjudicated prior criminal acts must be proved true beyond a reasonable doubt before they can be relied upon in the penalty determination. (*People* v. *Gates, supra,* 43 Cal.3d at p. 1202; *People* v. *Robertson* (1982) 33 Cal.3d 21, 53 [188 Cal.Rptr. 77, 655 P.2d 279].)[22] Of course, the instruction is not required as to proof of a prior felony conviction. (*People* v. *Wright, supra,* 52 Cal.3d at p. 437; *People* v. *Morales* (1989) 48 Cal.3d 527, 566 [257 Cal.Rptr. 64, 770 P.2d 244].) We have frequently determined that the absence of the instruction is not prejudicial when the evidence of defendant's commission of a violent crime is uncontroverted. (*People* v. *Morales, supra,* 48 Cal.3d at p. 566; *People* v. *Ainsworth, supra,* 45 Cal.3d at p. 1031; *People* v. *Miranda, supra,* 44 Cal.3d at pp. 97-98; *People* v. *Gates, supra,* 43 Cal.3d 1168, 1202.) We have also said that when evidence of prior activity not amounting to a violent crime is admitted in violation of *Boyd, supra,* 38 Cal.3d 762, if its admission is not prejudicial it follows that failure to instruct under *Robertson, supra,* 33 Cal.3d 21, is not prejudicial as to that evidence. (*People* v. *Wright, supra,* 52 Cal.3d 367, 438.)

---

[21]Defendant complains that counsel's failure to move for continuance was ineffective assistance of counsel, but says he will address the argument in his anticipated petition for writ of habeas corpus.

[22]We must reject defendant's federal constitutional arguments regarding the failure to give this instruction, since, as we have held, the duty to give the instruction is not constitutionally based. (*People* v. *Benson, supra,* 52 Cal.3d at pp. 810-811; *People* v. *Miranda, supra,* 44 Cal.3d at p. 98.)

■■■ Defendant argues that there was some evidence upon which to base a reasonable doubt of his guilt of the various assaults the jury heard about at the penalty trial. He argues that with respect to the evidence of his assaults on Los Angeles Police Officers Kaufman and Guzman, and on his wife, there was some evidence that he had epileptic seizures during those episodes. This could have raised a question of diminished capacity, as could defendant's mother's testimony regarding defendant's head injuries and diagnosis of epilepsy. But, as respondent points out with respect to Kaufman and Guzman, the evidence was that the assaults occurred after defendant's recovery from the seizures. There was no expert evidence suggesting a causal connection between the seizures and any act of violence. Vague and general evidence of epilepsy from a layperson hardly suggests justification or excuse for any particular assault. With respect to the attack on Cathy Smith, the evidence was that defendant struck her in anger, and there was no substantial evidence that the physical assault which she said occurred during the seizure was involuntary.

■■■ With respect to the evidence of defendant's attack on witness Mesquita, since Mesquita initiated the fight, defendant argues that a significant issue of self-defense arose. ■■■■ However, any right of self-defense is limited to the use of such force as is reasonable under the circumstances. (*People* v. *Clark* (1982) 130 Cal.App.3d 371, 380 [181 Cal.Rptr. 682].) The right of self-defense did not provide defendant with any justification or excuse for using deadly force to repel a nonlethal attack. (*Ibid.*) Further, the right of self-defense does not extend beyond the time of real or apparent danger; once Mesquita fled, the right of self-defense did not excuse defendant's conduct. (See *People* v. *Parrish* (1985) 170 Cal.App.3d 336, 352 [217 Cal.Rptr. 700]; *People* v. *Evans* (1969) 2 Cal.App.3d 877, 882 [82 Cal.Rptr. 877]; 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 246, p. 282.)

■■■ With respect to Deputy Sheriff Piggott's testimony regarding defendant's fights and assaults in jail, since Piggott had no personal knowledge of the events, but merely related the contents of defendant's file, defendant complains simply that the evidence was weak. Given the scope of the penalty phase evidence, however, we do not find a reasonable possibility that a properly instructed jury would have reached a different penalty determination.

In addition, Piggott testified to numerous infractions that did not appear to involve the actual commission of a crime. Defendant complains that the court's failure to instruct on the elements of any offenses that may have been shown by the evidence made the failure to instruct on reasonable doubt more

prejudicial. Failure to instruct on elements, however, is not error, in the absence of a request from defendant. (*People* v. *Melton, supra,* 44 Cal.3d at p. 755.) As we have seen, the evidence of jailhouse assaults was uncontroverted, and we see no reasonable possibility that failure to instruct on reasonable doubt with respect to these offenses was prejudicial to defendant. (See *People* v. *Wright, supra,* 52 Cal.3d at p. 438.)

■■■ Defendant also directs our attention to evidence from the guilt phase of trial that may have been used by the jury at the penalty phase to show prior crimes of violence. He points in particular to the statement of Art Corona to the police, suggesting that defendant was involved in another double homicide, an assault on an elderly woman, and robbery. Defendant also points to guilt phase evidence that defendant stuck a knife through a witness's door, that he threatened to kill Corona, that he had been involved in a previous shootout over a drug theft, and that he had "gotten away with something like this before."[23]

We have said that the reasonable doubt instruction is required when other-crimes evidence is used in aggravation at the penalty trial, but that when the evidence is admitted at the guilt phase and is not referred to at the penalty trial, the reasonable doubt instruction is not required. (*People* v. *Rich* (1988) 45 Cal.3d 1036, 1121 [248 Cal.Rptr. 510, 755 P.2d 960]; see also *People* v. *Morales, supra,* 48 Cal.3d at p. 566.) In discussing factor (b) of section 190.3, the prosecutor referred the jury to the penalty phase evidence alone. Accordingly, the statement of Art Corona, to which the prosecutor did not refer at any point in her penalty phase argument, did not give rise to a duty to instruct on reasonable doubt.[24] The evidence that defendant stabbed a door with a knife was admissible as a circumstance of the charged offense, and thus was independently admissible under factor (a). (*People* v. *Ainsworth, supra,* 45 Cal.3d at p. 1031; see also *People* v. *Morales, supra,* 48 Cal.3d at p. 566.)

Defendant also refers to testimony of Eric Klemetti at the guilt trial that he and defendant had been "busted for burglary." Again, this was not referred to at the penalty trial and was elicited by defense counsel for an entirely different purpose, that is, to impeach Klemetti's credibility.

Defendant also refers us to his own testimony that he had committed "hundreds" of armed robberies of drug dealers. Again, this testimony was

---

[23]The last statement was stricken by the trial court and would not have been considered.

[24]Defendant claims the jury must have considered in the penalty determination the evidence of his prior crimes of violence contained in Art Corona's statement to the police, since the jurors asked for the transcript of Corona's statement during penalty deliberations. There is nothing to indicate that their request indicated an interest in the other-crimes evidence, as opposed to some other part of Corona's statement; in any case, they cancelled the request before they received the transcript, having reached a verdict.

proffered to enhance the credibility of defendant's denial that he committed this particular offense. It was essentially a strange variety of good character evidence and, in any case, was uncontroverted.

The prosecutor did refer to defendant's threat to kill Art Corona in her penalty phase argument, but not in the context of factor (b) of section 190.3. She used the threat in an attempt to anticipate defendant's argument that his crime was not as heinous as other infamous criminals whose lives had been spared. She argued not that the threat was prior violent criminal activity under factor (b), but that Corona would not be safe unless the jury imposed the death penalty: "He was planning to murder Art Corona. Rest assured if he had the chance he would. [¶] So is life without possibility of parole right for him? If you spare his life, will it be at the expense of someone else's?" The reasonable doubt instruction would not have been helpful to the jury in evaluating the evidence.

### b. *Brown Error*

 Defendant claims that the giving of the instruction that "If you conclude the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death," combined with the prosecutor's closing argument and the language of the penalty verdict forms, misled the jury as to its sentencing function, citing *People* v. *Brown* (1985) 40 Cal.3d 512, 542 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]. He claims that the risk the jury was misled was enhanced because the quoted instruction was given separate from the other instructions, after the closing arguments of counsel.

 In those cases in which the potentially misleading instruction complained of here is given, "we examine the record to determine whether the jury might have been misled to the defendant's prejudice about the scope of its sentencing discretion." (*People* v. *Jones, supra*, 53 Cal.3d at p. 1147.)

 Any risk that the jury engaged in mechanical counting of aggravating factors was dispelled by the court's special instruction directing the jury not to approach the penalty determination in this way.[25] The special instructions also made it clear that the jury's task was to determine the

---

[25]The instruction stated: "Within the broad categories of aggravation and mitigation, the law of this state does not place any specific weight or numerical value on any particular aggravating or mitigating circumstance. It is entirely up to you to determine whether in your independent opinion one or more factors outweighs others, no matter what their number. [¶] In weighing the aggravating and mitigating factors, you are not to merely count the numbers on either side. One mitigating circumstance may be sufficient to support a decision that death

appropriate punishment. (Compare *People* v. *Cooper, supra,* 53 Cal.3d at p. 845.) The court also instructed that in determining the sentence, the jury could "decide to exercise mercy on behalf of the defendant" and that the guilt phase admonition not to be swayed by sympathy or pity no longer applied. These instructions made it highly unlikely the jury would think itself compelled to return a death verdict without being convinced that death was appropriate. (*People* v. *Jones, supra,* 53 Cal.3d at p. 1148; *People* v. *Ramirez, supra,* 50 Cal.3d at p. 1200.) We also assume the jury considered the instructions as a whole, as they were instructed to do. Thus we are not persuaded by defendant's argument that the timing of the instruction made any difference to the jury's understanding of its task, particularly since the jury had all the instructions before it in writing during deliberations.

 Defendant points to the following argument of the prosecutor: "Your job is made, I know it's hard, but it's made easy by the instruction you will get before you retire to deliberate. This is if you conclude the aggravating circumstances outweigh the mitigating circumstances, you shall impose the sentence of death. [¶] However, if you determing [*sic*] the mitigating circumstances outweigh the aggravating circumstances, you may impose sentence of confinement in state prison without the possibility of parole. [¶] What mitigating circumstances were presented? Nothing except a mother who loves her son. Even the most heinous person born, even Adolph [*sic*] Hitler probably had a mother who loved him. [¶] If you were to put the aggravating and mitigating on a scale, I would suggest the scales would be so tipped it would be incredible. Just incredible."

We do not think the prosecutor's argument misled the jury. It "did not argue that death was mandatory, or denigrate the jury's role in making a normative decision about the appropriate penalty." (*People* v. *Pensinger, supra,* 52 Cal.3d at p. 1265.) The reference to a scale did not suggest the jury should simply count the factors (see *People* v. *Hendricks* (1988) 44 Cal.3d 635, 652 [244 Cal.Rptr. 181, 749 P.2d 836]), especially in light of the court's curative instructions. (See *People* v. *McDowell* (1988) 46 Cal.3d 551, 576 [250 Cal.Rptr. 530, 758 P.2d 1060].) The prosecutor concluded by directing the jury to spare defendant's life if they found "one redeeming factor" in his past, present or future, but informing them that her view was that death was the "only just verdict." We see no possiblity the prosecutor's argument to the jury caused it to misinterpret the court's instructions.

 We are also not persuaded that the verdict forms misled the jury in the penalty determination. Defendant complains that the verdict forms directed the jury to weigh the factors without directing it to determine the

---

is not the appropriate punishment in this case. [¶] The weight you each give to any factor is for you individually to decide."

appropriateness of death in a separate process. This is not error. (*People* v. *Boyde, supra,* 46 Cal.3d at pp. 253-254; *People* v. *Hendricks, supra,* 44 Cal.3d at p. 655.)

Because we do not agree that the jury was misled into believing that its task was in any way mechanical, or that the penalty determination was to be made without regard to the jury's normative decision regarding the appropriateness of the penalty, we cannot agree that the instructions given violated the Eighth Amendment or defendant's rights to due process and a fair and reliable determination of penalty under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. (*People* v. *Mickey, supra,* 54 Cal.3d at p. 700 and fn. 19.)

### 5. *Excessive Special Circumstances*

■ Defendant argues that not only were the two multiple-murder special circumstances duplicative, but also that the two burglary-murder and robbery-murder special circumstances were duplicative under the reasoning of *People* v. *Harris* (1984) 36 Cal.3d 36, 64-67 [201 Cal.Rptr. 782, 679 P.2d 433]. He argues not that there should be a merger of a robbery-murder special circumstances and a burglary-murder special circumstance under section 654, but that under section 654 there was only one robbery-murder special circumstance and only one burglary-murder special circumstance. We have rejected the general reasoning of *Harris* on which defendant relies. (*People* v. *Melton, supra,* 44 Cal.3d at p. 766.) As we said regarding the specific argument raised here in *People* v. *Andrews, supra,* 49 Cal.3d 200, rejecting the argument in the context of multiple robbery-murder special circumstances: "It is of no significance that each murder occurred in the course of the same robbery . . . . When a defendant entertains a single principal objective during an indivisible course of conduct, he may nonetheless be punished for multiple convictions if during the course of that conduct he committed crimes of violence against different victims." (*Id.* at p. 225.) The same reasoning applies to multiple burglary-murder special circumstances alleged in connection with a multiple murder. Accordingly, we must reject defendant's claim, that the trial court's failure to instruct the jury to disregard what he terms the duplicative special circumstances violated due process under the state and federal Constitutions and created an unreliable penalty determination in violation of the Eighth Amendment and article I, section 17 of the California Constitution.

### 6. *Proportionality*

■ Defendant argues that it is a violation of the Eighth Amendment and our state constitutional proscription against cruel and unusual punishment to impose the death penalty against him. He argues that the decision to

seek the death penalty against him and not against codefendant Brown was based on inaccurate and unreliable information about their involvement in the crime and their criminal records. He claims the prosecutor was under the misapprehension that he had been solely responsible for the murders, and that his criminal record was worse than Brown's.

We do not normally review the charging decisions of prosecutors unless there is invidious discrimination in charging (see Gov. Code, § 26501; *People* v. *Morris, supra,* 53 Cal.3d at p. 235, fn. 25; *People* v. *Keenan, supra,* 46 Cal.3d 478, 506-507; *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 297 [124 Cal.Rptr. 204, 540 P.2d 44]; *People* v. *Vatelli* (1971) 15 Cal.App.3d 54, 58-59 [92 Cal.Rptr. 763]); none is claimed here. Defendant claims his punishment is disproportionate because the charging decision was based on inaccurate information, but the issue is not the information upon which the charging decision was made, but the evidence produced at trial.

We rejected a similar claim in *People* v. *Sanders, supra,* 51 Cal.3d 471. There the prosecutor sought the death penalty against only one of two jointly charged defendants. We commented that although the evidence against each defendant was similar, it was the normative decision of the jury that determined the death penalty was warranted against Sanders. (*Id.* at p. 529.) That decision was not constitutionally suspect under the usual rules of proportionality review. (See *People* v. *Dillon* (1983) 34 Cal.3d 441, 448 [194 Cal.Rptr. 390, 668 P.2d 697] [applying Cal. Const.].) The same is true here. (Compare *People* v. *Morris, supra,* 53 Cal.3d at pp. 234-235.)

7. *Motion for Modification*

Defendant claims the trial court's statement of reasons for denying the automatic motion for modification of the verdict shows that the court misunderstood the scope of relevant aggravating and mitigating evidence. Although the court did state that there was no evidence that would extenuate the gravity of the crime, there is no indication that the court considered that only such evidence was relevant in mitigation. (See *People* v. *Edwards, supra,* 54 Cal.3d at p. 847; *People* v. *Siripongs* (1988) 45 Cal.3d 548, 585 [247 Cal.Rptr. 729, 754 P.2d 1306].) The court did not reject defendant's evidence in mitigation as irrelevant, but as unpersuasive. It is in this context that we read the court's statement that it found no circumstances in mitigation. The court also instructed the jury that evidence of any aspect of the defendant's character or record that defendant proffered in support of a sentence less than death could be considered. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) As in *People* v. *Edwards, supra,* 54 Cal.3d at page 847: "The court's discussion as a whole

showed an awareness it had to independently reweigh *all* the evidence, including the mitigating evidence."

■ Defendant also claims the trial court erred in relying on the same erroneously admitted aggravating evidence upon which the jury relied in reaching the penalty verdict. He adds that the trial court refused his proposed instruction that would have confined the jury's consideration of aggravating evidence to factors listed in section 190.3. He infers from this refusal that the court must have considered nonstatutory aggravating evidence.

The trial court's statement of reasons for denying the motion for modification shows that the court restricted itself to statutory factors in aggravation. We have rejected the claim that evidence erroneously admitted under *People* v. *Boyd, supra,* 38 Cal.3d 762, requires reversal of the penalty verdict; there was no objection and in light of the circumstances of the charged crimes and the volume of evidence of prior criminal activity, any error was harmless. We reject the claim with respect to the trial court's ruling on the same basis.

### 8. *Miscellaneous Contentions*

a. ■ Defendant contends the jury was not given the expanded instruction on factor (k) of section 190.3 recommended in *People* v. *Easley, supra,* 34 Cal.3d at page 878, footnote 10. He is mistaken; the instruction was given. The instruction is "sufficient to advise the jury of the full range of mitigating evidence, and nothing more is required." (*People* v. *Edwards, supra,* 54 Cal.3d at pp. 841-842; *People* v. *Sully, supra,* 53 Cal.3d at pp. 1244-1245.)

b. ■ Defendant claims the prosecutor improperly argued evidence proffered in mitigation, such as his epilepsy and good upbringing, were actually to be considered in aggravation. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 289-290 [221 Cal.Rptr. 794, 710 P.2d 861].) The argument is barred because defendant failed to object. (*People* v. *Edwards, supra,* 54 Cal.3d at pp. 838-840.) In any event, the prosecutor simply discounted defendant's evidence as unpersuasive, and argued the epilepsy was feigned. This was permissible comment on the evidence. (See *People* v. *Caro* (1988) 46 Cal.3d 1035, 1062-1063 [251 Cal.Rptr. 757, 761 P.2d 680]; see also *People* v. *Sully, supra,* 53 Cal.3d at pp. 1249-1250.)

c. ■ The court's failure to delete "inapplicable" aggravating circumstances from its instruction was not error. (*People* v. *Jones, supra,* 53 Cal.3d at p. 1147; *People* v. *Beardslee, supra,* 53 Cal.3d at pp. 112-113.)

d. ▮▮▮ Neither the failure of section 190.3 to designate nor the court's failure to instruct the jury which factors are mitigating and which are aggravating was error. (*People* v. *Andrews, supra,* 49 Cal.3d 200, 233; *People* v. *Allison* (1989) 48 Cal.3d 879, 898 [258 Cal.Rptr. 208, 771 P.2d 1294]; *People* v. *McLain* (1988) 46 Cal.3d 97, 118 [249 Cal.Rptr. 630 [757 P.2d 569].)

e. ▮▮▮ The court's admission of evidence of unadjudicated crimes at the penalty phase did not violate defendant's due process, Sixth Amendment or Eighth Amendment rights. (*People* v. *Jennings, supra,* 46 Cal.3d at pp. 980-981; *People* v. *McDowell, supra,* 46 Cal.3d at pp. 568-569.)

f. ▮▮▮ Defendant contends the statute of limitations had run on the criminal activity proffered in evidence in aggravation at the penalty trial, so that admission of the evidence was a violation of his "statutory, due process and Eighth Amendment rights." He failed to object to the evidence on this basis and, in any event, we have rejected the argument on the merits. (*People* v. *Sully, supra,* 53 Cal.3d at pp. 1245-1246; *People* v. *Jennings, supra,* 46 Cal.3d at pp. 981-982.)

g. ▮▮▮ Defendant contends the court erred in failing to instruct sua sponte that the corpus delicti of other crimes had to be proved independently of his admissions and that his admissions had to be viewed with caution. The court gave the instructions at the guilt trial. There was no sua sponte duty to deliver them at the penalty trial. (*People* v. *Thompson* (1988) 45 Cal.3d 86, 128 [246 Cal.Rptr. 245, 753 P.2d 37].)

h. ▮▮▮ Defendant claims the court should have instructed that defendant's prior kidnapping conviction could only be considered under factor (b) *or* factor (c) of section 190.3, not both. He is wrong. (*People* v. *Melton, supra,* 44 Cal.3d at pp. 764-765.) ▮▮▮ He also claims the court should have instructed the jury not to consider the charged offenses under factors (b) and (c). But on this record there is no possibility the jury would have done so. The prosecutor made it clear that the charged offenses were relevant under factor (a), that the prior kidnapping conviction was relevant under factor (c), and that the penalty phase evidence of defendant's prior criminal activity other than the charged offenses was relevant under factor (b). Nothing in the instructions or the arguments of counsel would have misled the jury into the error defendant complains of. (See *People* v. *Adcox, supra,* 47 Cal.3d 207, 272; *People* v. *Miranda, supra,* 44 Cal.3d at p. 106.)

i. ▮▮▮ Despite defendant's contention to the contrary, "[t]he 1978 death penalty statute is not unconstitutional even though it does not

require findings that (i) death is the appropriate penalty beyond a reasonable doubt, (ii) aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, (iii) aggravating circumstances were true beyond a reasonable doubt . . . ." (*People* v. *Duncan* (1991) 53 Cal.3d 955, 979 [281 Cal.Rptr. 273, 810 P.2d 131].) Further, the statute is not unconstitutional for failing to provide a " 'procedure to enable the reviewing court to evaluate meaningfully the sentencer's decision.' " (*People* v. *Sully, supra,* 53 Cal.3d at p. 1251, and cases cited.)

j. We have consistently rejected defendant's argument that the court must instruct that the jury may not consider prior criminal activity under factor (b) of section 190.3 unless it unanimously finds the activity has been proven. (*People* v. *Cox, supra,* 53 Cal.3d at p. 692; *People* v. *Malone, supra,* 47 Cal.3d at p. 48; *People* v. *Ghent, supra,* 43 Cal.3d at pp. 773-774.) We have also consistently rejected the claim that the court must instruct on the elements of the other crimes shown by the evidence. (*People* v. *Carrera, supra,* 49 Cal.3d at p. 342 and cases cited.)

k. Contrary to defendant's claim, the court was under no duty to instruct sua sponte that life imprisonment without parole means that defendant would never be considered for parole. (*People* v. *Duncan, supra,* 53 Cal.3d at p. 979 and cases cited.)

l. The court was under no obligation to instruct the jury, in addition to all the instructions given, that the jury "should consider affirmatively all sympathetic mitigating factors, including nonstatutory mitigation." The instructions given adequately informed the jury of the factors to be considered in mitigation. (See *People* v. *Edwards, supra,* 54 Cal.3d at pp. 841-842; *People* v. *Sully, supra,* 53 Cal.3d at pp. 1244-1245.)

### 9. *Cumulative Error*

 Defendant contends that cumulative error infected the penalty phase, so that there could have been no reliable determination of penalty. We disagree. We have determined the errors that did occur were "few in number and minimal in significance." (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 1006 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

Defendant asks us to take judicial notice of items in the prosecutor's file indicating that there was some dispute in the district attorney's office as to whether the office should seek the death penalty against defendant. Defendant argues that the memoranda of the deputy who opposed seeking the death penalty establish that the case against defendant was not overwhelming. He argues that it follows that any errors that occurred in the course of the trial must have been prejudicial in the penalty determination.

We doubt that it would be appropriate to take judicial notice of internal memoranda of the district attorney's office in this proceeding because we question whether the documents represent "official acts" of an executive agency. (Evid. Code, §§ 452, 459.) In any event, we fail to understand how the evaluation of a case by a single supervising deputy district attorney before trial can have any impact on our evaluation whether errors were harmless in the context of the trial. Nor was the dissenting deputy's evaluation of the facts particularly accurate; he apparently thought defendant did not plan a robbery and resorted to personal violence only when his escape from the scene of a burglary was blocked. The evidence developed at trial convincingly showed that defendant did plan to rob the owner of the home where the murders took place. Thus we reject defendant's claim.

### III. CONCLUSION

We set aside one of the multiple-murder special-circumstance findings, and the judgment otherwise is affirmed in its entirety.

Lucas, C. J., Panelli, J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

Appellant's petition for a rehearing was denied May 14, 1992, and the opinion was modified to read as printed above.